UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| BOYD RATHKE, | ) | CIV. 08-5084 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**TABLE OF CONTENTS**

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-5

**FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-51

    **A.**    **Medical Evidence in the Record** . . . . . . . . . . . . . . . . . . . .6-40

    **B.**    **Testimony at the Hearing** . . . . . . . . . . . . . . . . . . . . . . . . 40-46

    **C.**    **Decision of the ALJ** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46-51

**DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52-92

    **A.**    **Standard of Review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52-54

    **B.**    **Whether the ALJ Failed to Adjudicate Rathke's**
        **SSD/DIB Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54-63

        **1.**    **Rathke's Second Application for Title II Benefits** . . .55-57

        **2.**    **Rathke's Third Application for Title II Benefits** . . . . 57-61

3.       **Whether the Reopening Provisions of the Regulations Apply** . . . . . . . . . . . . . . . . . . . . . . . . . . . .61-63

C.       **Whether the ALJ Failed to Develop Retrospective Evidence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .63-69

       1.       **Whether *Res Judicata* Applies to Rathke's Previous Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . 65-66

       2.       **Whether Good Cause for Reopening Rathke's Claims is Present** . . . . . . . . . . . . . . . . . . . . . . . . . 66-68

       3.       **The Effect of Counsel's Silence at the 2006 Hearing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68-69

D.       **Whether the ALJ Conducted an Appropriate Analysis at Step 3** . . . . . . . . . . . . . . . . . . . . . . . . . . 69-72

E.       **Whether the ALJ's Credibility Assessment is Supported by Substantial Evidence** . . . . . . . . . . . . . . . . . . . . . . . . . .72-83

       1.       **Rathke's Failure to Undergo Treatment for Hepatitis C** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74-76

       2.       **Rathke's Lack of Mental Health Counseling** . . . . . . . 76-77

       3.       **Rathke's Use of Marijuana to Control Weight** . . . . . . 77-78

       4.       **Infrequency of Doctor Visits** . . . . . . . . . . . . . . . . . . 78-81

       5.       **Conflicting Accounts of Physical and Social Limitations** . . . . . . . . . . . . . . . . . . . . . . . . . . . .81-83

F.       **Whether the ALJ Conducted an Appropriate Analysis at Step 4** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83-89

G.       **Whether the ALJ Conducted an Appropriate Analysis at Step 5** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .89-92

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .92

**NOTICE TO PARTIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .92

## INTRODUCTION

This matter is before the court pursuant to a complaint filed by plaintiff Boyd Rathke on November 4, 2008, appealing the denial of his application for benefits by the Social Security Administration.  <u>See</u> Docket No. 1.  Defendant, the Commissioner of the Social Security Administration, opposes Mr. Rathke's complaint and seeks an order of the court affirming the agency's decision.  Docket No. 17.  The district court, the Honorable Jeffrey L. Viken, referred this matter to this magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  <u>See</u> Docket No. 21.

## PROCEDURAL HISTORY

The agency filed the transcript of the proceedings below as an attachment to its answer at Docket No. 11.  References to the administrative transcript are designated "A.R. __."  Because the transcript is too voluminous to be scanned into the electronic filing system, this court's references to the same are to the hard copy, located in the Clerk of Court's office.

Boyd "Buck" Rathke made his first application for disability insurance benefits on July 10, 1996, in the state of Washington.  A.R. 164.  The agency denied the claim on December 11, 1996.  A.R. 43.  Mr. Rathke filed a second claim for disability benefits on December 18, 1998.  A.R. 168.  The agency denied his claim on May 10, 1999.  A.R. 45.

Rathke made his third application for disability insurance benefits on February 24, 2003, alleging an onset of disability of March 15, 1993, and seeking benefits under Title II, Title XVI, Title XVIII, and Title XIX. A.R. 172. The agency denied the claim initially and upon reconsideration. A.R. 47-48, 83-86, 90-92. Mr. Rathke requested a hearing before an Administrative Law Judge ("ALJ"). A.R. 93-94. The hearing was held before Administrative Law Judge Larry M. Donovan on February 16, 2005. A.R. 97. Mr. Rathke was not represented by counsel at the hearing. A.R. 126. At the hearing, expert witnesses Dr. James Simpson and Jerry Gravatt testified. A.R. 118, 113.

On April 4, 2005, the ALJ issued a written decision that Mr. Rathke was not disabled, and was capable of performing a "significant range of sedentary work". A.R. 52-60. On May 24, 2005, Rathke's attorney, Lisa Koehn, requested that the agency Appeals Council review the ALJ's decision. A.R. 127. The Appeals Council remanded the case for reconsideration by the ALJ, citing inadequate evaluation of the conflicting medical opinions of Drs. Dang and Falkenburg, Mr. Rathke's treating and examining physicians, and for evaluation of the nature and severity of Mr. Rathke's "chronic pain syndrome, borderline intellectual functioning, schizophrenia, chronic fatigue, pancreatitis, headaches, arthritis, and carpal tunnel syndrome." A.R. 62. The Appeals Council made specific directives to the ALJ upon reconsideration. Id.

At the reconsideration hearing, on October 12, 2006, the ALJ retained a vocational expert, William Tysdal, and a non-examining psychologist, Michael Enright, Ph.D., to testify. Drs. Dang and Falkenburg were not asked to and did not appear at the reconsideration hearing. A.R. 27. The ALJ issued another five-step denial on November 21, 2006. A.R. 24-42. The ALJ stated that Mr. Rathke was not disabled, A.R. 41, had a residual functional capacity for a light exertional level, A.R. 36, and that there existed a significant number of jobs in the national economy that Mr. Rathke could perform. A.R. 40.

On December 11, 2006, Attorney Koehn requested review of the ALJ's decision. A.R. 22. Koehn withdrew from representation on May 12, 2008. A.R. 19. The Appeals Council denied Mr. Rathke's request for further review on June 6, 2008. A.R. 16. Attorney Catherine Ratliff entered an appearance on Mr. Rathke's behalf, and the Appeals Council permitted her to submit additional evidence and a brief in support. A.R. 14-15. On September 30, 2008, the Appeals Council considered the additional evidence and brief, but affirmed the ALJ's decision. A.R. 10-12. The matter thus became appealable to the district court. Mr. Rathke timely filed this appeal on November 4, 2008, seeking a reversal of the ALJ's decision, an order for payment of disability benefits, and any other appropriate relief, to include an award for attorney's fees. Docket No. 1. Alternatively, Mr. Rathke seeks a reversal and remand for a *de novo* review of all issues. Id.

**FACTS**

## A.  Medical Evidence in the Record

On July 2, 1994, Rathke arrived at Valley General Hospital (hereinafter "Valley General") in Monroe, Washington, complaining of abdominal pain and vomiting blood.  A.R. 446.  An x-ray showed that Rathke's stomach was full of food, but no evidence of enlargement or hardening of internal organs was present.  A.R. 447.  The abdominal exam was coded negative for abnormalities. Id.  No treatment plan was indicated in the medical records.  Id. at 446-47.

On July 21, 1994, Rathke arrived at Valley General after experiencing pain and swelling in his jaw for three weeks.  A.R. 432-45.  Rathke had previously been prescribed antibiotics and discharged, but presented again complaining of pain and suffering "severe trismus."[1]  A.R. 433.  Rathke's wisdom teeth had apparently become infected and abscessed.  Id.  He was treated with intravenous and oral antibiotics and released four days later.  Id.

On May 8, 1995, Rathke was taken by ambulance to the Valley General Emergency Room ("ER") after being pinned by a car which fell from a jack while Rathke was working under it.  A.R. 428.  One of the car's tires landed on Rathke's left chest.  Id.  Rathke complained of pain in his left chest that worsened when he took deep breaths.  Id.  Rathke was described as well-

---

[1]Trismus is better known as lockjaw, a condition characterized by difficulty opening the jaw and mouth.  Dorland's Illustrated Medical Dictionary 1996 (31st ed. 2007).

6

developed and well-nourished, and had alcohol on his breath at the time he arrived in the emergency room. Id. His left chest was tender to touch, but breath sounds in both lungs were full and clear. Id. Rathke also had a small scalp laceration which did not require sutures. Id. His eyes appeared and functioned normally. Id. His gait was steady, and he demonstrated "no focal, motor, or sensory deficit." Id. He had full range of motion of all of his extremities and joints. Id. Rathke was given a prescription for Vicodin and was discharged.[2] A.R. 429.

On May 15, 1995, Rathke again reported to the Valley General ER, complaining of headaches resulting from the previous week's crushing accident. A.R. 423. Rathke reported that his headaches were worsening and were not relieved with Vicodin. Id. Rathke also reported numbness in the left side of his face, which the ER physician speculated was due to possible neurological deficits. Id. Rathke had no other complaints, and denied any paresthesias[3] or motor weakness. Id. Rathke's eyes showed no evidence of trauma or

---

[2]Vicodin is a narcotic administered to relieve moderate to moderately severe pain. It is a Schedule III controlled substance and is likely to cause psychic dependence, physical dependence, and tolerance with repeated use. Vicodin may impair the mental and/or physical abilities required for potentially hazardous tasks such as driving or operating heavy machinery. PHYSICIAN'S DESK REFERENCE 535-36 (61st ed. 2007).

[3]Paresthesias is an abnormal sensation, such as burning or prickling, in the absence of an external stimulus. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1404 (31st ed. 2007).

impairment.  Id.  Rathke's chest exam noted no crackling.  Id.  A CT scan of

Rathke's head was normal, and negative for abnormalities.  Id.  Rathke was

prescribed Demerol, Vistaril, and Tylox for pain relief and showed "good relief of

pain" on the same.[4]  Id.  Rathke was subsequently discharged.  Id.

On October 13, 1995, Rathke underwent a physical evaluation after

complaining of shortness of breath and post-tussive emesis.[5]  A.R. 372.  He

filled out a questionnaire and self-reported a myriad of physical and emotional

symptoms.  A.R. 375.  Dr. David Levitt, doctor of internal medicine for the

Washington State Department of Social and Health Services, diagnosed Rathke

with interstitial lung disease,[6] and was assessed to have the ability to tolerate

only sedentary work.  A.R. 372-73.  However, Dr. Levitt's notes indicated that

treatment might improve Rathke's ability to work at least half time in the light-

---

[4]Demerol (generic name Pethidine) is a narcotic pain reliever that may be habit-forming and is not indicated for patients with a history of drug abuse or addiction.  It is also not recommended for persons with a history of head injury, liver disease, breathing disorders, or mental illness.  PHYSICIAN'S DESK REFERENCE 3385-86 (61st ed. 2007).  Vistaril (generic name Hydroxyzine) is a sedative used to treat anxiety and tension, and may also be used to control nausea and vomiting.  PHYSICIAN'S DESK REFERENCE 3385-86 (61st ed. 2007).  Tylox is a schedule II narcotic also known as Percocet.  It contains a combination of oxycodone and acetaminophen.  PHYSICIAN'S DESK REFERENCE 1131-32 (61st ed. 2007).

[5]Post-tussive emesis means Rathke vomited after forceful coughing.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 616, 2019 (31st ed. 2007).

[6]Interstitial lung disease is a condition that causes progressive scarring of lung tissue and affects one's ability to breathe and get enough oxygen into the bloodstream.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 965 (31st ed. 2007).

to-sedentary exertional level.  A.R. 373.  Dr. Levitt prescribed steroids and agonists for Rathke's lungs, and ordered pulmonary function tests and nebulizer treatment.[7]  A.R. 373.

On October 19 and 20, 1995, Rathke phoned Dr. Levitt to report he could no longer tolerate his Azmacort prescription because it made his kidneys hurt.[8]  A.R. 370.  Rathke reported that the medicine caused him immediate lower back pain, but that the pain subsided after about an hour.  A.R. 371.  Dr. Levitt's nurse advised Rathke to discontinue the drug and make an appointment with Dr. Levitt.  A.R 370-71.  On October 23, 1995, Rathke presented to Dr. Levitt at the Sky Valley Medical Center for an evaluation of lung function, over the counter medications, and a Department of Heath Services evaluation.  A.R. 368-69.  Rathke complained of a cough, anxiety, and tremors.  A.R. 369.  Rathke had stopped taking Azmacort and reported that he had reduced his tobacco

---

[7]An agonist is "a drug that has affinity for and stimulates physiologic activity at cell receptors normally stimulated by naturally occurring substances." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 41 (31st ed. 2007). Nebulizer treatment involves the ingestion of drugs through an aerosol spray. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1253 (31st ed. 2007).

[8]Azmacort is an aerosol corticosteroid/anti-inflammatory agent, indicated for the treatment of asthma and improved lung function. PHYSICIAN'S DESK REFERENCE 1727-28 (61st ed. 2007).

intake to less than one-half a pack of cigarettes per day. A.R. 369. He reported that his "nerves" were "bad," so Dr. Levitt prescribed Valium for him.[9] A.R. 369.

On November 3, 1995, Mr. Rathke presented to the Valley General ER complaining of having a piece of metal lodged in his right eye. A.R. 354-55; 419-20. The injury occurred four days earlier, while Rathke worked on the engine of his car and a "rust ring" chipped away and flew into his eye. A.R. 355. The treating physician attempted unsuccessfully to remove the shrapnel. Id. Rathke was given antibiotic eye ointment, referred to an ophthalmologist and discharged. A.R. 355-56.

On August 12, 1996, Rathke was again seen by Dr. Levitt. A.R. 365. Rathke complained of uncontrollable coughing, lung problems, and difficulty breathing. A.R. 365, 367. He stated that he coughed so hard he "popped a rib." A.R. 367. Rathke was diagnosed with interstitial lung disease, and the doctor noted his abuse of tobacco. Id. During this visit, Rathke subjectively reported loss of memory resulting from the 1995 car-crushing accident and other incidents involving closed head trauma. Id. Dr. Levitt recommended continuation of treatment with inhaled and oral steroids, and indicated that Rathke's condition was improved with medication. A.R. 366. Dr. Levitt indicated that sedentary work was appropriate, because more exertional work

_____

[9]Valium is a benzodiazepine derivative, "indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety." PHYSICIAN'S DESK REFERENCE 2819 (61st ed. 2007).

would cause shortness of breath.  A.R. 366.  Dr. Levitt also wrote that Rathke

would benefit from vocational rehabilitation, such as learning to do small engine

repair.  Id.

On August 16, 1996, Rathke presented to the Valley General Hospital for

a follow-up CT scan of his chest.  A.R. 416-17.  No significant abnormalities

were found.  A.R. 417.  There were no abnormal masses, signs of fluid buildup,

pleural abnormalities, or pleural calcifications.  Id.  Rathke's lungs showed no

evidence of interstitial lung disease at that time.  Id.

On November 7, 1996, clinical psychologist Dr. David J. Mashburn,

Ph.D., completed a psychological evaluation of Rathke.  A.R. 357-60.  Rathke

complained generally of "not being healthy," and alleged head injury, memory

problems, and anxiety.  A.R. 357.  Dr. Mashburn's report notes that Rathke

grew up not knowing his biological father, and was raised by three different

step-fathers.  A.R. 357.  Mr. Rathke dropped out of high school at the eleventh

grade and attempted to enlist in the military, but was not accepted because he

was "an idiot."  A.R. 357.  He was twice married and divorced, and lived with a

girlfriend, Terry Gillio, with whom he had two sons and whom he considered his

common-law wife.  A.R. 171-72, 357.

Dr. Mashburn's notes indicate that Rathke said he always had difficulty

with people, but that in the years prior to 1996 he became increasingly anxious

and had difficulty being sociable.  A.R. 357.  Rathke reported that he worked in

gold and mineral mines and oil fields for a number of years, but couldn't remember the sequence of his jobs or how long he performed each job.  Id.

Rathke reported to Dr. Mashburn that he began using marijuana at age 17 and continued to use it when he did not have to pay for it.  A.R. 357.  He admitted to having used cocaine and heroin, but denied present use of either substance.  A.R. 357.  He admitted to drinking six beers per day, every day, and had never received treatment for his alcohol abuse.  A.R. 357.  Rathke reported that he had been arrested for DWI, but no longer drove a car due to anxiety. A.R. 358.

Dr. Mashburn noted Rathke had "extreme difficulty" remembering dates and sequences of events.  A.R. 358.  His scores on the memory test were in the low average range.  A.R. 358-59.  Rathke reported experiencing wide mood swings, frequent anxiety, and depression.  A.R. 358.  Rathke had difficulty forming sentences and finding words.  Id.  Rathke reported having difficulty with day-to-day living activities due to anxiety and nervousness.  Id.  He reported having given up activities he once enjoyed or was able to do, due to his frustration and lack of ability to remember and concentrate.  A.R. 358-59.  Dr. Mashburn noted Rathke's claims of past head injuries, but said there was no significant loss in brain functioning according to the specific tests administered at that time.  A.R. 359.

Dr. Mashburn reported that although Rathke reported marked to extreme difficulty with daily functioning , anxiety, and panic attacks, his distressing feelings did not result in a complete inability to function outside of his home. A.R. 359. Dr. Mashburn noted Rathke's depression and low concentration, but explained that Rathke's alcohol and drug abuse "could certainly be producing the symptoms" and that no diagnosis could be relied upon until Rathke's substance abuse was under control. A.R. 360. Likewise, Dr. Mashburn theorized that Rathke's poor memory and concentration could be caused by his depression and anxiety. A.R. 359. Dr. Mashburn concluded that handling money was not in Rathke's best interest due to his abuse of alcohol. Id. Finally, Dr. Mashburn diagnosed Rathke with several Axis I disorders, including substance abuse; agoraphobia (provisional upon Rathke's alcohol abuse being in remission); major depression (also provisional upon remission of alcohol abuse); and possible generalized anxiety disorder. A.R. 360. Dr. Mashburn diagnosed no Axis II disorders, and noted possible head injury and lung problems on Axis III.[10] Id.

On November 30, 1996, Dr. Steven Haney, M.D., reviewed

---

[10]The DSM-IV-TR, or Diagnostic and Statistical Manual of Mental Disorders, is "the standard diagnostic tool used by mental health professionals" to diagnose and treat psychiatric disorders. Each disorder in the DSM-IV has a diagnostic code and lists diagnostic criteria and other information. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, FOURTH EDITION, TEXT REVISION (American Psychiatric Association ed., 2000).

Dr. Mashburn's psychiatric evaluation of Mr. Rathke in order to make a disability determination as to Mr. Rathke's claimed mental impairments. A.R. 329-38. Dr. Haney determined that although Mr. Rathke reported having severe problems with memory and concentration, the tests he underwent with respect to those faculties did not confirm the existence of any impairment. A.R. 338. Dr. Haney administered the WMS-R, and Rathke scored in the low average range.[11] A.R. 338. Dr. Haney noted that Dr. Mashburn was unable to definitively diagnose Rathke because Rathke admitted chronic alcohol and drug abuse, and stated that any diagnosis of anxiety or depression would be unreliable while Rathke continued to abuse drugs and alcohol. A.R. 338. At the time he was evaluated, Rathke had alcohol on his breath and admitted drinking six beers every day. A.R. 338. He also admitted smoking marijuana any time it was made available to him without cost. A.R. 357. Consequently, Dr. Haney diagnosed Rathke with depression and anxiety disorder , coded as DSM-IV section 12.04 - Affective Disorders, and substance addiction affecting the central nervous system, coded as DSM-IV section 12.09 Substance Addiction Disorders. A.R. 332, 335. Dr. Haney stated that there was "no medically determinable impairment apart from [Rathke's] alcohol and drug

---

[11]WMS-R stands for "Wechsler Memory Scale - Revised. The WMS-R is a test used to evaluate working memory.

abuse." Id. Dr. Haney noted, however, that Rathke's drug and alcohol abuse would interfere with regular attendance during a normal work week. Id.

Dr. Haney evaluated the "B" criteria of listing 12.09 to rate the severity of Rathke's substance abuse. A.R. 336. Dr. Haney determined that Rathke's substance abuse moderately limited his daily living activities and social functioning. A.R. 336. Dr. Haney determined that the substance abuse frequently limited Rathke's concentration, persistence or pace, resulting in failure to complete tasks in a timely manner. Id. Finally, Dr. Haney noted that the substance abuse never caused episodes of deterioration or decompensation in work-like settings. Id. Thus, the "B"criteria of the listing were not met.

Dr. Haney also evaluated Rathke's mental residual functional capacity ("RFC"). A.R. 339-44. Dr. Haney determined that Rathke retained "an ability to understand and remember detailed instructions." A.R. 343. He also found Rathke "should be able to maintain concentration to the extent that he could carry out detailed instructions," but that his alcohol and drug use would significantly limit his ability to carry on during a work week with any measure of consistency. Id. Dr. Haney determined that a workplace setting with minimal interpersonal contact with other people would be appropriate, and that Rathke should be able to adjust to changes in the workplace. Id. The mental RFC assessment and the psychiatric review were reviewed and affirmed by Dr. Joan Davidson, M.D., on April 10, 1997. A.R. 329, 341.

On December 2, 1996, Rathke reported to the Respiratory Care Department at Valley General Hospital for testing of his pulmonary functioning. A.R. 361-62. Rathke was diagnosed with COPD, or Chronic Obstructive Pulmonary Disease, and silicosis.[12] A.R. 361. The pulmonary function report indicated that Rathke improved significantly after receiving bronchodilator therapy, that his condition may be reversible in nature, and that Rathke would "most likely benefit from continued bronchodilator therapy." A.R. 362.

On December 27, 1996, Rathke was again seen by Dr. Levitt after complaining of shortness of breath and post-tussive emesis.[13] A.R. 363-64. Rathke was wheezing. A.R. 363. Rathke said he continued to cut back on smoking, and that he could not tolerate Azmacort therapy. Id. Dr. Levitt reported that treatment up to this date was fair and showed slight improvement. Id. He ordered pulmonary function tests and a CT scan of Rathke's lungs. Id. Dr. Levitt determined that given his condition at the time, Rathke could perform only sedentary work, should not be exposed to fumes or dust, and would be unable to perform at least half-time in a normal work

_____

[12]Silicosis, also called grinder's disease, is the "deposition of large amounts of dust or other particulate matter in the lungs" caused by inhalation of dust containing silica, with formation of nodular fibrotic changes in the lungs. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1491, 1742 (31st ed. 2007).

[13]See supra note 5 and accompanying text.

setting for three months. A.R. 364. Dr. Levitt opined that treatment would improve Rathke's lung functioning. Id.

On April 10, 1997, Rathke was evaluated by Dr. M.L. Gulick, M.D., who diagnosed Rathke with stress or exercise-induced asthma, which caused "very significant interference with the ability to perform . . . work-related activities. A.R. 466. Rathke denied using alcohol or drugs other than tobacco, but Dr. Gulick noted that Rathke's elevated liver enzymes suggested that alcohol use was a problem. A.R. 467. Dr. Gulick stated that Rathke was able to perform medium-exertional work, that there were no environmental limitations necessary, and that Rathke was not impeded from performing at least half-time work in a normal day-to-day setting. A.R. 467. He had full range of motion in both shoulders. Id.

Rathke reported to the Valley General ER again on July 21, 1997, complaining of chest pain, fever, and a cough. A.R. 407-08. Rathke denied any nausea, vomiting, diarrhea, or other illness. A.R. 408. Rathke reported he had prescriptions for Maxair Autohaler and Beclovent, but that he was not currently taking these medications.[14] Id. The ER physician, Dr. Robert Russell, noted wheezing in both lungs and an elevated body temperature, but no other

---

[14]Maxair Autohaler is an oral inhaler to be used for prevention and reversal of bronchospasm. PHYSICIAN'S DESK REFERENCE 1853 (61st ed. 2007). Beclovent (generic name Beclomethasone) is a corticosteroid used to prevent airway inflammation and the symptoms of asthma. PHYSICIAN'S DESK REFERENCE 3303 (61st ed. 2007).

abnormalities.  Id.  A chest x-ray revealed that Rathke had a "pleural based, wedge-shaped infiltrate in the right middle lobe."  Id.  Dr. Russell diagnosed Rathke with pneumonia, pleurisy, and bronchospasm.[15]  Id.  Rathke was given various medications to alleviate his pneumonia and fever, and was discharged.  A.R. 409.

On November 6, 1997, Rathke reported to the Valley General ER with an infected left arm.  A.R. 404-05.  Rathke had been "helping take down a barn" and was stabbed in the arm by a stray piece of sheet metal.  A.R. 405.  He also had numerous cuts and abrasions on his hands, and stated he received these injuries while working on cars.  Id.  Rathke was prescribed Keflex and Vicodin and was discharged.[16]  Id.

Mr. Rathke reported to the Department of Social and Health Services clinic on June 29, 1998, to get assistance filling out his Social Security paperwork.  A.R. 465.  An overall evaluation of Mr. Rathke stated that he wanted to work, was able to work in a non-exertional job, but needed vocational training in order to obtain such employment.  A.R. 465.  Rathke was indigent

---

[15]Pleurisy is the inflammation of the membranes lining the lungs and chest cavity.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1481-82  (31st ed. 2007).  Bronchospasm is the involuntary contraction of the smooth muscles of the air passages of the lungs.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 258, 257 (31st ed. 2007).

[16]Keflex is an antibacterial drug used to treat or prevent bacterial infections.  PHYSICIAN'S DESK REFERENCE 549 (61st ed. 2007).  Vicodin is a narcotic pain reliever.  See supra note 2 and accompanying text.

and had no health insurance at the time, so he was unable to afford the medications and steroid inhalers that had helped him achieve "vast improvement" in the past.  Id.  Rathke complained of shortness of breath, and the examining doctor noted his "substantially decreased forced expiratory volume."  Id.  Rathke was no longer taking his medications, including the steroid inhalers on which he had shown marked improvement in the past, because he could not afford them.  Id.

On February 26, 1999, Rathke was evaluated for physical impairment by Dr. Dan Phan, M.D., with VVMD Medical Clinic in Lynnwood, Washington.  A.R. 448-52.  Rathke reported that he had no regular physician because he "would not see a doctor if [his] life depended on it."  A.R. 449.  Rathke said he was able to walk ten blocks and lift 200 pounds, but had difficulty carrying that weight.  A.R. 449.  Rathke said he could climb stairs, but rarely did so.  Id.  Rathke said he began smoking at age 12 and smoked a pack a day.  Id.  However, Rathke also said he had quit tobacco smoking.  A.R. 448.  Dr. Phan noted Rathke's long-term tobacco and drug abuse.  A.R. 451.

Rathke had no problem participating in the physical examination.  Id.  Rathke's lungs were clear, with an absence of rales and wheezes.  Id. at 450.  Rathke's shoulder joints and all other extremities had normal range of motion.  Id.  His muscle tone and motor strength was good.  Dr. Phan noted that Rathke's functional capacity was normal and that he was able to work as a self-

employed mechanic.  A.R. 451.  Although Rathke reported lung problems, Dr.

Phan made no objective finding that Rathke suffered from pulmonary distress.

A.R. 450.

On March 11, 1999, Dr. Thomas Fleming completed a physical RFC

assessment of Mr. Rathke.  A.R. 382-87.  After reviewing all the evidence in

Rathke's file, Dr. Fleming determined Rathke had few major exertional

limitations.[17]  A.R. 383.  Dr. Fleming noted that although Rathke's subjective

complaints included lung problems, his previous chest x-ray and CT scan were

normal, and he scored above 100% for his height and weight in a pulmonary

functioning test.  Id.  Dr. Fleming noted that a pulmonary functioning test

performed in December, 1996 showed "early obstructive pulmonary

impairment," but that a repeat PFT in February, 1999, was normal.  Id.

Dr. Fleming also noted that Rathke's complaints of heart problems were not

substantiated by his medical records and were not limiting.  A.R. 384.

There was no evidence of spinal problems.  Id.

Dr. Fleming recommended a limitation to medium exertional activities

due to early obstructive pulmonary disease and Rathke's past history of

silicosis, but said there were no postural, manipulative, visual, or

---

[17]Specifically, Dr. Fleming found that Rathke could occasionally lift and carry fifty pounds; could frequently lift and carry twenty-five pounds; and could stand, walk, and sit, for about six hours in every eight-hour workday.  Rathke's ability to push and pull with his arms and feet was unlimited.  A.R. 383.

communicative limitations.  A.R. 384.  Dr. Fleming found the only

environmental limitation necessary was avoidance of concentrated exposure to

fumes, odors, dusts, and gases.  A.R. 385.  Dr. Fleming found significant that

although Rathke claimed he was "severely limited," he was twice injured in

1995 while doing automotive work and injured his arm in 1997 while taking

down a barn.  A.R. 386.  Dr. Fleming found Rathke's credibility similarly lacking

in that his alleged heart and lung problems were unsubstantiated by the record.

Id.  Dr. Fleming opined that the previous medical opinions of

Drs. Bryan, Gulick, and Levitt were not supported by objective physical

findings.  Id.  Dr. Fleming's assessment of Rathke's RFC was affirmed on

September 20, 1999.  A.R. 387.

On March 31, 1999, Rathke was evaluated for psychological disability by

Dr. Kent Reade, Ph.D., in Everett, Washington.  A.R. 453-55.  Dr. Reade relied

on Mr. Rathke's subjective reports and on the February, 1999, physical exam by

Dr. Phan.  A.R. 453.  Rathke said he occasionally smoked marijuana, and drank

"two beers a weekend."  A.R. 453.  Rathke had numerous complaints, including

noise sensitivity, anxiety, and memory problems.  Id.  Rathke reported angry

moods and having anxiety since his car crushing incident in 1995.  Id.  Rathke

had never had any mental health treatment of any kind and avoided doctors

when possible.  Id.  Rathke reported he had "never been a heavy drinker."  Id.

Rathke reported never having any substance abuse treatment.  A.R. 454.  He

said he was able to fix meals for his children and vacuumed daily, unless he was "stressed out." A.R. 454. He said he did not socialize, but he visited with friends when they came to his home. Id.

Dr. Reade determined Rathke had Generalized Anxiety Disorder, with elements of agoraphobia, social phobia, and dysthymia. A.R. 455. Dr. Reade noted that ruling out avoidant features was necessary. Id. There was no evidence of psychosis. A.R. 454. Dr. Reade determined Rathke's memory was fair, and he was capable of handling funds. A.R. 455. Dr. Reade summarized that Rathke suffered from pervasive and persistent anxiety, chronic tension, low stress tolerance, and avoidance of social contact. Id.

On April 23, 1999, Rathke's functional capacity and psychiatric state were again assessed. A.R. 388-91. Dr. Nelson, Ph.D., found Rathke was not significantly limited in several aspects of understanding and memory, sustained concentration and persistence, some aspects of social interaction, and adaptation. A.R. 388. Dr. Nelson found Rathke's ability to maintain attention and concentration for extended periods to be moderately limited. Id. Dr. Nelson also found moderate limitations in Rathke's ability to interact appropriately with the general public, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to respond appropriately to changes in the work setting. Id. Dr. Fleming explained that it was Rathke's low mood and anxiety that affected his ability to concentrate for prolonged

periods, but that he could focus adequately on most tasks.  A.R. 390.  He also

explained that Rathke's social withdrawal and anxiety interfered with the ability

to relate comfortably to others, but that Rathke could "cooperate sufficiently on

work assignments."  Id.  Dr. Fleming noted that Rathke demonstrated reduced

tolerance to stress which interfered with "optimal adaptation to change."  Id.


Dr. Nelson found Rathke's overall psychological impairment to be

moderate.  A.R. 393.  Dr. Nelson found Rathke to have elements of dysthymia[18]

under listing 12.04.  A.R. 395.  Under listing 12.06,  Dr. Nelson found the

presence of generalized persistent anxiety disorder, accompanied by motor

tension, autonomic hyperactivity, and apprehensive expectation.  A.R. 396.   Dr.

Nelson found no indication of behavioral or physical changes associated with

regular use of alcohol or other substances.  A.R. 398.  Dr. Nelson did not find

that any of the "B" criteria of the listings met the degree of limitation required to

satisfy the listings.  A.R. 399.  Dr. Fleming's findings were reviewed by Dr.

Stephen G. Goldberg, Ph.D., on July 29, 1999, and were affirmed in full.  A.R.

388-400.

On June 3, 1999, Rathke was evaluated by Dr. Timothy C. Bryant with

the Washington State Department of Social and Health Services after Rathke

_____

[18]Dysthymia refers to characteristics of mild depression.  DORLAND'S
ILLUSTRATED MEDICAL DICTIONARY 590 (31st ed. 2007).

applied for Social Security disability benefits. A.R. 456-67. Rathke complained of constant shortness of breath, and said he could walk only a block to a block and-a-half before needing to rest. A.R. 457. Dr. Bryant's notes indicate Rathke's subjective complaints included "two pillow orthopnea,"[19] a history of high blood pressure, chronic cervical pain, and silicosis of the lungs. A.R. 457. Dr. Bryant found Rathke had coarse bronchi with loud breath sounds and some wheezing. Id. He determined that Rathke was limited to performing sedentary work due to cervical pain, pulmonary hypertension with interstitial fibrosis, and brochospasm. A.R. 458. However, Dr. Bryant also found that Rathke's conditions were "potentially reversible . . . if proper treatment" was initiated. Id. The medical records note that Rathke had "vast improvement" with prior treatment and medication, and that Rathke's ability to participate in treatment was limited by his indigence and the clinic's lack of free samples. Id. Dr. Bryant nonetheless recommended a full "OSHA workup" of pulmonary function and limitations. Id. at 458-59, 461.

In February, 2001, Rathke reported to the Valley General ER after falling off a roof and sustaining injuries to his left leg. A.R. 590-96. Rathke had been on the roof of a friend's house, and fell 20 feet onto concrete below. A.R. 592. His fractured tibia was splinted, and Rathke was discharged with instructions

---

[19]Shortness of breath that is relieved by assuming an upright position, typically by being bolstered with pillows. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1359 (31st ed. 2007).

to keep his leg elevated and iced.  A.R. 594.  He was given a prescription for Percocet.  Id.

Rathke reported to the Valley General ER again on May 28, 2002, complaining of rib injuries.  A.R. 583-89.  Rathke was being towed on a sled behind a truck, when one of the skis attached to the sled broke away and hit him in the right ribs.  A.R. 584.  He had multiple rib fractures on his right side.  A.R. 588.  He was given a prescription for Vidodin.[20]

In August, 2002, Dr. Hector Camacho, PA-C, evaluated Rathke at the Community Health Center of Snohomish County, in Washington.  A.R. 518-20.  Dr. Camacho noted the various health problems Rathke reported to him.  A.R. 519.  Rathke denied any alcohol history or drug addiction.  Id.  Rathke admitted smoking two packs of cigarettes per day for the previous twenty years.  Id.  Rathke's lungs were clear, with no crackles, wheezing, or rales.  A.R. 519.  Dr. Camacho ordered a series of lab tests.  A.R. 520.

In September, 2002, Rathke was seen by Dr. Carolyn Sherman, M.D., for a follow-up appointment after Dr. Camacho's evaluation the previous month.  Dr. Sherman noted that Rathke's routine screening labs from his appointment

---

[20]See supra note 2 and accompanying text.

with Dr. Camacho showed "elevated transaminase."[21]  A.R. 517.  Rathke then

admitted that he was "drinking moderate amounts of alcohol" at the time

Dr. Camacho drew his blood, but told Dr. Sherman that he had now quit

drinking.[22]  A.R. 517.  Rathke said he had no history of hepatitis, but had a

history of IV drug use.  Id.  Dr. Sherman prescribed Vioxx, which would not

clear through the liver like the medications Dr. Camacho had prescribed.  A.R.

517.  It was later determined Rathke had contracted hepatitis C.

   In November, 2002, Rathke was seen by Dr. Sujoy Ghorai, M.D., who

evaluated Rathke's symptoms and concerns regarding his hepatitis C infection.

A.R. 502-04.  At that point, Rathke reported being able to do odd jobs, drive

heavy machinery, work construction, and do "whatever is available."  A.R. 502.

Rathke said he had not had alcohol for the last three years, but admitted

drinking several beers every night before he quit drinking.  Id.

   Dr. Ghorai told Rathke that treatment for hepatitis C would include total

abstention from drug and alcohol use for six months prior to beginning therapy.

A.R. 503.  Dr. Ghorai discussed treatment with PEG-Interferon and Ribavirin,

---

[21]Transaminase is an enzyme that is released into the blood stream after liver or heart disease.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1977 (31st ed. 2007).

[22]The court notes that Rathke denied alcohol use at the time he was evaluated by Dr. Camacho.  See A.R. 519.

but Rathke decided he wanted to forego any decisions that day and think about whether to undergo treatment for his hepatitis C.  A.R. 503.

On March 13, 2003, Rathke reported "remarkable improvement" in the level of pain he experienced while taking methadone for his chronic pain syndrome.  A.R. 510.

On May 11, 2003, June 13, 2003, and again on June 15, 2003, Rathke reported to the Valley General ER complaining of acute abdominal pain and vomiting.  A.R. 540-41, 549.  Rathke showed marked improvement with IV fluids and Dilaudid for pain.[23]  A.R. 541.  Dr. Michael Ingram noted that Rathke's symptoms could possibly be cause by peptic ulcer disease, inflammatory bowel condition, or irritable bowel syndrome, and he referred Rathke to a gastrointestinal specialist.  A.R. 541.  Dr. John Bennet noted that Dilaudid and Phenergan helped alleviate Rathke's pain.[24]  A.R. 549.  Rathke said he had prescriptions for OxyContin and Vicodin for pain, but hadn't been taking the medicine as prescribed.  A.R. 541.  Rathke he had considerable pain relief with Phenergan, so he was given a prescription for the same and was discharged from the hospital.  Id.

---

[23]Dilaudid is an opioid analgesic administered to relieve moderate to severe pain.  PHYSICIAN'S DESK REFERENCE 440-41 (61st ed. 2007).

[24]Phenergan is an antihistamine to be taken either orally or by suppository, that is administered to alleviate nausea and vomiting.  PHYSICIAN'S DESK REFERENCE 3440-41 (61st ed. 2007).  Phenergan acts as a central nervous system depressant.  Id.

An x-ray of Rathke's abdomen, taken on May 12, 2003, showed no acute abnormalities.  A.R. 568.  A CT scan of his pelvis, taken May 11, 2003, was also negative for any abnormalities.  A.R. 569.  A CT scan of his upper abdomen on May 11, 2003, was negative for any abnormalities, except for a "tiny cyst" within Rathke's liver.  A.R. 577.  An ultrasound of Rathke's abdomen, including his liver, gallbladder, bile duct, pancreas, kidneys, and spleen was negative for abnormalities.  A.R. 578.

On May 29, 2003, Rathke reported improved quality of life while taking methadone, and was "active" and able to build bird and bat houses for a living.  A.R. 507.  Rathke had clear breath sounds in both lungs in May, 2003.  Id.

On July 12, 2003, Rathke reported to Dr. Tobias Dang, M.D., for a psychiatric evaluation pursuant to his application for disability benefits.  A.R. 602-06.  Rathke stated he had used alcohol daily since age 12, and admitted drinking up to two quarts of hard liquor in a day.  A.R. 602-03.  Rathke said he stopped drinking alcohol in December, 2002.  A.R. 603.  Rathke reported several emotionally traumatic experiences throughout his life.  A.R. 602.  Rathke was "significantly unkempt" and dirty.  A.R. 604.

Dr. Dang diagnosed Rathke with Post-Traumatic Stress Disorder, chronic Major Depression, alcohol dependence in early full remission, Cannabis dependence, and noted the need to rule out mood disorder due to a medical condition (specifically, Rathke's hepatitis C).  A.R. 605.  Dr. Dang stated that

although Rathke's depression, PTSD, and anxiety would cause difficulty dealing with a stressful work environment, Rathke had previously been able to work for ten years as a mechanic. A.R. 606. Dr. Dang noted Rathke's marijuana abuse as a possible contributing factor to Rathke's depression, but Rathke insisted that his drug use "contributed to his improvement and being able to function to some degree." Id. Rathke stated that he didn't have the energy to work. Id. His memory and cognition were intact. Id. Dr. Dang opined that Rathke would be able to complete simple and repetitive tasks for approximately four hours per day. Id.

On August 23, 2003, Rathke presented to the emergency room at Custer Community Hospital in Custer, South Dakota, complaining of having abdominal pain, diarrhea, nausea, and vomiting for the prior three days. A.R. 608-16. Dr. Robert Nitschelm, M.D., examined Rathke and noted that his gastrointestinal symptoms could be caused by withdrawal from Rathke's chronic use of pain medication, since Rathke reported having run out of his Alprazolam and OxyContin three days to two weeks prior to this ER visit. A.R. 608. There was no obstruction of Rathke's small bowel. A.R. 612. Rathke received Zofran, Demerol, IV fluids, and Cipro, and showed "reasonably good improvement in discomfort" after receiving the medications.[25] A.R. 609. He was prescribed

_____

[25]Zofran is used to treat nausea and vomiting. PHYSICIAN'S DESK REFERENCE 1641 (61st ed. 2007). Cipro is an antibacterial drug that is prescribed to treat bacterial infections. PHYSICIAN'S DESK REFERENCE 2977-79 (61st ed. 2007).

Phenergan suppositories, OxyContin, Alprazolam, and Cipro.  Id.  Rathke was instructed to follow up with Dr. Joy Falkenburg, M.D., in the local health clinic in Edgemont, South Dakota.  Id.

In August, 2003, Dr. Kristine Harrison, Psy.D., determined that Rathke suffered from major depression, PTSD, alcohol dependence in remission, and marijuana dependence.  A.R. 468-86.  Dr. Harrison determined that Rathke's allegations of mental disability due to mental impairment were not fully supported by the evidence in his medical records.  A.R. 470.  Rathke was found to be able to understand, remember, and complete simple tasks, and Dr. Harrison found that his mood and anxiety were the main causes of any disruption of attention span.  Id.  Rathke reported minimal ability to do household chores, but Dr. Harrison's first-person and other third-party observations indicated that Rathke did in fact help with chores, do woodworking for four hours daily, and watch TV.  A.R. 470-71.  Dr. Harrison's evaluation states that Rathke could "meet basic adaptive demands of the workplace," and that he was able to work with co-workers and supervisors.  A.R. 471.  Rathke's poor hygiene, anxiety, and depression were the only factors noted in discussing limitations to working with the public at large.  A.R. 471.  Dr. Harrison diagnosed Rathke with Affective Disorders (12.04), Anxiety-Related Disorders (12.06), and Substance Addiction Disorder (12.09), but found that his symptoms did not meet the degree of limitation that would satisfy the "B"

criteria of the listings for any of his diagnosed disorders. A.R. 483. Dr. Harrison's assessment was reviewed on February 24, 2004 and was affirmed in all respects.[26] A.R. 473.

Rathke's physical RFC was again evaluated in August, 2003. A.R. 487-92. It was established that Rathke could occasionally lift 20 pounds, could frequently lift and carry 10 pounds, could sit and stand for six hours in an eight-hour workday, and had unlimited ability to perform pushing and pulling motions, including operation of hand or foot controls. A.R. 488. No postural limitations were established, aside from some limitation as to gross motor manipulation. A.R. 489. The evaluation noted that Rathke had full range of motion of both wrists and had a normal gait. A.R. 488. The assessment also noted that Rathke declined treatment for his hepatitis C, so the condition was left uncontrolled. Id. Finally, the assessment notes a lack of credibility as to Rathke's subjective complaints, because he reported lifting up to fifty pounds and building bird houses, but also complained that he was only able to vacuum once every three weeks due to pain. A.R. 489.

Rathke saw Dr. Falkenburg on September 2, 2003. A.R. 621-22. She documented Rathke's history of medical and mental health issues, as reported by him that day. Id. Dr. Falkenburg noted that Rathke's anxiety and

_____

[26]The court is unable to discern the signature of the reviewing medical consultant, aside from his or her first two initials and the first initial of the doctor's surname, "D.J. S____." A.R. 472-73.

depression were managed somewhat poorly, and that although he asked for an increased dosage of Alprazolam, his anxiety would be better managed by increasing his Zoloft because the former medication has "addictive behavior potential." A.R. 621. Rathke noted that he had experienced no problems with his chronic pancreatitis since he quit drinking a year earlier. A.R. 622.

Rathke told Dr. Falkenburg that he had a heart attack in 2002, but that he refused ambulatory transport to a hospital and did not receive any medical treatment.[27] A.R. 622. Dr. Falkenburg noted Rathke's chronic hepatitis C with cirrhosis, history of anxiety, chronic pain syndrome, severe depression with dysthymia, history of pancreatitis, and reflux disease. A.R. 623. Dr. Falkenburg required Rathke to sign a medication contract whereby he agreed to get prescriptions only from her, to fill his prescriptions on a regular basis, and to plan ahead for the times he would need extra medications. Id. Dr. Falkenburg started Rathke on Reglan because she suspected his irritable bowels were caused by gastroparesis.[28] Id. She discontinued his prescription

---

[27]The court notes there is no documented evidence of heart trouble, heart attack, or angina prior to September, 2003, in the medical records.

[28]Reglan is used to treat heartburn caused by acid reflux. PHYSICIAN'S DESK REFERENCE 2599 (61st ed. 2007). Gastroparesis is a condition that affects the stomach's ability to empty properly. It causes early satiety, nausea, and vomiting. PHYSICIAN'S DESK REFERENCE 776 (61st ed. 2007).

for Compazine because of concern for dystonic reaction.[29]  A.R. 623.  Rathke

was instructed to follow up in four weeks.

On September 30, 2003, Rathke saw Dr. Falkenburg again.  A.R. 618-19.

He said his anxiety was increased, and asked for an elevated dose of Xanax.[30]

A.R. 618.  Dr. Falkenburg again voiced her concern that Xanax was highly

addictive, and stressed the need to avoid escalating use of the drug.  Id.  Rathke

said his pain was well-controlled with OxyContin and Percocet, but said the

Reglan was not helping his nausea and vomiting.  Id.  Dr. Falkenburg reminded

Rathke that he needed to sign a medical release and ensure that his previous

medical records were sent to the clinic.  Id.  She noted that he was "generally

well-appearing," and noted no pressing medical issues at the time, other than

continued management of his chronic pain, depression, and anxiety.  A.R. 619.

All of his conditions were well-controlled with medication at this time.

Dr. Falkenburg saw Rathke again on December 19, 2003.  A.R. 670.  She

noted the need to limit his ability to get pain medicine prescriptions elsewhere,

due to his chronic use of high-dose narcotics.  A.R. 670-71.  Rathke was on the

---

[29]Compazine (generic name prochlorperazine) is an antipsychotic medication
that can be used to treat anxiety, nausea, and vomiting.  Drug Information Online
Drugs.com, http://www.drugs.com/mtm/compazine.html (last visited January
15, 2010).   Dystonic reaction is the involuntary contraction of muscles.
PHYSICIAN'S DESK REFERENCE 590 (61st ed. 2007).

[30]Xanax (generic name alprazolam) is a benzodiazepine used to treat anxiety.
Drug Information Online Drugs.com, http://www.drugs.com/xanax.html (last
visited January 15, 2010).

highest-available dose of Zoloft, and wanted to increase his dose of Xanax. A.R. 670. She also noted the need to refer Rathke to Behavioral Management if his anxiety was not relieved by increasing his dose of Zyprexa, rather than the habit-forming benzodiazepines. Id.

Rathke's RFC was again assessed by Dr. Greg Erickson in January and February, 2004. A.R. 493-501. Rathke could lift and carry 50 pounds occasionally, and lift and carry 25 pounds frequently. A.R. 494. The assessment notes that Rathke was not a candidate for Interferon therapy for hepatitis C because of his own noncompliance and substance abuse. A.R. 494-95. Dr. Erickson's notes indicate that Rathke's alcohol use exacerbated his past abdominal pain and pancreatitis, and that he experienced no pain or pancreatitis flare ups when he was not drinking. A.R. 495. The assessment also states that Rathke's claims of heart and lung problems were not substantiated by the record. A.R. 495. It was noted that Rathke continued to smoke marijuana and a pack of cigarettes daily. Id. No change was made to the previous RFC determination made on January 20, 2004. A.R. 500.

Rathke was admitted to the Custer Community Hospital ER on January 8, 2004, complaining of abdominal pain, vomiting, and withdrawal symptoms because he had not gotten his pain medications refilled in a timely manner. A.R. 625. Rathke was hospitalized for three days. Dr. Terry Graber, M.D.,

noted that Rathke needed to avoid alcohol, nicotine, caffeine, and NSAIDs[31], none of which Rathke was apparently doing. A.R. 626. Rathke was dehydrated. Dr. Graber considered Rathke's abdominal pain to be "multifactorial," and noted that there was no way to conclusively say it was caused by infection. Id. Dr. Graber made note of Rathke's poor diet, unhealthy use of substances and liver-irritating medications. Id.

Dr. Denise Hanisch also saw Rathke on January 8, 2004, and noted that Rathke's symptoms, including, chills, fever, shakes, and nausea were entirely due to withdrawal from his OxyContin, as he had not filled his prescription on time. A.R. 627-28. X-rays of Rathke's abdomen and chest were negative for abnormalities. A.R. 655-56. After pain medications were resumed, Rathke's discomfort and distress abated. A.R. 629-37. Despite being advised repeatedly to quit smoking, Rathke asked to go outside to have a cigarette. A.R. 631.

On January 16, 2004, Rathke visited the Edgemont clinic for a check up after his hospitalization for narcotic withdrawal. A.R. 667. Despite a full workup during his hospitalization, "nothing was found" except for the withdrawal symptoms. Id. Rathke still had not obtained his prior medical records for Dr. Falkenburg and refused any further labs or testing. A.R. 668. His abdominal pain had not increased, and his depression and anxiety were

---

[31]Nonsteroidal anti-inflammatory drug. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1312 (31st ed. 2007).

being managed adequately with medications.  A.R. 668.  Rathke again refused

treatment for his Hepatitis C and pancreatitis.  Id.  Dr. Falkenburg again

explained her concern about Rathke's dependence on addiction-forming drugs,

but Rathke said nothing else controlled his anxiety.  A.R. 688.

On February 3, 2005, Dr. Falkenburg noted that Rathke's ability to do

work-related activities was limited due to his chronic dependence on high-dose

narcotics and his borderline mental functioning.  A.R. 671.  It is unclear

whether Dr. Falkenburg had Rathke's prior medical records at this time; it

appears she relied on a physical exam and Rathke's self-reported schizophrenia,

anxiety and depression in stating her opinions.  A.R. 672.  No mention of

Rathke's alleged shoulder impairment was noted.  A.R. 672.  She opined that he

was able to sit for an entire 8-hour workday, but was very limited in his ability

to continuously stand or walk during a workday.  A.R. 674.  Dr. Falkenburg

opined that environmental limitations were appropriate due to Rathke's reliance

on high-dose narcotics.  A.R. 675.  She noted that the narcotic drugs affect

cognition, mechanical and motor skills, and level of consciousness.  A.R. 675.

Rathke was seen in the Edgemont Clinic by Dr. Falkenburg for

evaluations of his various health conditions on December 17, 2004 (A.R. 705);

March 25, 2005 (A.R. 703); June 17, 2005 (A.R. 701); August 15, 2005 (A.R.

699); October 14, 2005 (A.R. 697); November 8, 2005 (A.R. 696); December 13,

2005 (A.R. 695); January 13, 2006 (A.R. 694); February 8, 2006 (A.R. 693);

April 21, 2006 (A.R. 691); May 26, 2006 (A.R. 690). The frequent visits were apparently scheduled in order for Dr. Falkenburg to reissue prescriptions for Rathke's various pain medications and ensure he was not using more pain pills than prescribed. His routine visits during this period of time were generally unremarkable. The first appearance of Rathke's angina is noted on December 17, 2004, as well as his prescription for Lisinopril and Nitrostat.[32] A.R. 705.

On June 2, 2005, Rathke's mental health was assessed by Behavior Management Systems. A.R. 677-80. The assessment was based on Rathke's subjective reports, and apparently not on any objective medical evidence. A.R. 677. Rathke blamed his cognitive deficits, including poor short-term memory, on previous head injuries. A.R. 678. He made no mention of addiction or dependence on high-dose narcotics. Id. He reported that he started to drink heavily in his twenties, after a friend's drowning death, and that he wanted to isolate himself. A.R. 679. Rathke said he was depressed and had thoughts of suicide. A.R. 678. Rathke said he had nightmares, extreme guilt, and

---

[32]Lisinopril is a drug administered to treat hypertension and manage heart failure. PHYSICIAN'S DESK REFERENCE 2052-53 (61st ed. 2007). Nitrostat is more commonly known as nitroglycerine, administered for the prevention of high blood pressure due to coronary artery disease. PHYSICIAN'S DESK REFERENCE 3046-47 (61st ed. 2007).

flashbacks as a result of his friend's drowning death.  Id.  Rathke was

diagnosed with PTSD and Major Depression.[33]  Id.

On September 15, 2005, Rathke again ran out of one of his prescription

medications (Protonix[34]) because he failed to refill his prescription on time.  A.R.

689.  Rathke also reported having none of his medications in October, 2005,

because he was off Medicaid insurance and could not afford his prescriptions.

A.R. 697.  Rathke had been out of his pain and psychological medications for

some time.  Id.  Dr. Falkenburg noted Rathke had recently been charged with

domestic violence and that his wife was "out of work again."  Id.  Dr. Falkenburg

counseled them that they needed to get health insurance and obtain financial

assistance.  A.R. 697.

In early November, 2005, Dr. Falkenburg referred Rathke to Dr. Michael

Kadrmas, M.D., to examine Rathke's right shoulder, as Rathke complained of

pain and some immobility.  A.R. 696-97, 684-86.  Rathke had a partial tear of

his right rotator cuff, but his numerous co-morbidities (specifically, his end

stage cirrhosis, psychiatric problems, and recurrent pancreatitis) made him a

poor candidate for surgery.  A.R. 684, 685.  Rathke received a corticosteroid

---

[33]The court notes that although the case manager's notes direct the reader to the "Case Service Plan" for her initial plan and recommendations, the Case Service Plan does not appear in the record.  A.R. 678.

[34]Protonix is used as a short-term treatment for erosive esophagitis and heartburn symptoms.  PHYSICIAN'S DESK REFERENCE 3470-71 (61st ed. 2007).

injection to help with pain management, and he was referred to physical therapy to strengthen his shoulder without surgery.  Id.  He was seen by Dr. Falkenburg on May 26, 2006, for another steroid injection and to get a refill of his methadone prescription.  A.R. 690.

On April 21, 2006, Rathke saw Dr. Falkenburg again, complaining of various ailments, including his hepatitis C, shoulder pain, pancreatitis, and abdominal pain.  A.R. 691.  Rathke chose not to undergo treatment of his hepatitis because of his psychiatric problems, and understood that this choice would "eventually result in liver failure and death."  A.R. 691.  Rathke's depression and anxiety were being adequately controlled with medications.  Id.

On September 28, 2006, Dr. Falkenburg completed a medical source statement of Rathke's ability to do work-related physical activities.  A.R. 710-16.  She determined that his ability to lift and carry weight was almost nonexistent, in that he could lift ten pounds or less only very infrequently, or less than 1/3 of the time.  A.R. 710.  Dr. Falkenburg reported Rathke could carry up to twenty pounds occasionally, but could never carry more than twenty pounds.  Id.  She also stated Rathke could sit and stand for five hours at one time, with no interruptions.  A.R. 711.  Rathke could walk for four hours without interruption.  Id.  Rathke could sit for an entire eight-hour workday, and could stand and walk for five and four hours each workday, respectively.  Id.  Rathke was unable to reach overhead, push, or pull with his right arm.  A.R. 712.

Rathke could operate foot controls frequently.[35]  A.R. 712.  Rathke was unable

to crouch or crawl, but could occasionally climb stairs, ramps, or ladders; keep

his balance, stoop, and kneel.  A.R. 713.  It was recommended that Rathke not

be exposed to unprotected heights or driving because of his chronic use of high

dose narcotics, but he could frequently tolerate all other environmental

conditions.  A.R. 714-15. Rathke was able to take care of his personal needs,

including activities such as shopping, bathing, traveling unaccompanied, and

preparing food.  A.R. 715.

**B.      Testimony at the Hearing**

At the hearing on October 12, 2006, clinical psychologist Dr. Michael

Enright testified via telephone as a non-treating mental health expert.  A.R. 796.

At the outset, Dr. Enright asked the ALJ to clarify whether Mr. Rathke used

alcohol or marijuana regularly, and whether he had received treatment for

substance use.  A.R. 798.  Mr. Rathke stated that he last used alcohol "five or

six years ago," and that he last smoked marijuana "the other day."  A.R. 799.

Dr. Enright testified that the medical evidence in the record supported

diagnoses of depression, coded under 12.04; generalized anxiety disorder and

PTSD, coded under 12.06; and Cannabis dependence, coded under 12.09.  A.R.

800.  Dr. Enright testified that the medical records did not support diagnoses of

---

[35]"Frequently" is described as meaning from one-third to two-thirds of the
time.  A.R. 710.

schizophrenia or psychosis.  Id.  Dr. Enright testified as to the symptoms of each of the diagnoses supported by the evidence in the medical records.  A.R. 800-01.  Dr. Enright noted that none of the "B" criteria under 12.04 or 12.06 were supported by the record.  A.R. 801-02.  He also testified that none of the "C" criteria for 12.04 or 12.06 were satisfied.  A.R. 802.

The ALJ asked Dr. Enright whether there would be any workplace limitations based on Mr. Rathke's mental health, and Dr. Enright testified that he believed there would be significant limitations in interacting with the public, and at least moderate limitations in accepting supervision or criticism from supervisors.  A.R. 802-03.  Dr. Enright said he thought Mr. Rathke could engage in occasional telephone contact at work.  A.R. 803.  Mr. Rathke's attorney did not ask any questions of Dr. Enright.  Id.

The claimant, Mr. Boyd Rathke, testified both in response to questions from the ALJ and in response to questions from his attorney, Ms. Lisa Koehn. He testified that he was not working and had not worked since February of 2003 because he suffered from a variety of ailments.  A.R. 807.  He testified that he was unable to sit or stand for long periods of time because it "messes us [his] stomach" and he "lose[s] train of thought."  Id.  Mr. Rathke also described having torn tendons in his left shoulder which prevent him from using and

lifting his left arm.  A.R. 807-08.  Mr. Rathke described doing minimal household chores, but said his ability to do so was limited.[36]

Mr. Rathke stated that he took a medication for depression, another for anxiety, and another for pain.  A.R. 809.  Mr. Rathke admitted that the pain medication "stabilizes the pain to where it's tolerable."  A.R. 810.  The ALJ asked Mr. Rathke whether his conditions were aggravated by extreme heat or cold, or by dampness or humidity, and Mr. Rathke said his conditions were not so aggravated.  A.R. 811-12.  He said only his arthritic bones and joints were affected by dampness or humidity.  A.R. 812.  Mr. Rathke stated that the hepatitis C made him feel much colder and hotter than the average person would feel, and that his doctors wouldn't operate on his shoulder because he was taking Interferon.[37]  A.R. 811-12.

When asked whether he took pain medication specifically for his arthritis, Mr. Rathke stated he was "not really into pill taking," and figured his other pain pills would suffice to alleviate some of his arthritis pain.  A.R. 812.  Mr. Rathke said his conditions were definitely worsened by noise, and that he did not

---

[36]The court notes that Mr. Rathke testified that he does not do laundry, but that he admitted he doesn't do this chore because he was afraid of doing it "wrong," rather than because he is functionally limited and unable to perform the task.  A.R. 808-09.

[37]The court notes that the record demonstrates Rathke was never on Interferon therapy for his hepatitis C, due to Rathke's noncompliance and past psychological history.

operate a motor vehicle unless accompanied by another person.  Id.  He stated

that he rarely traveled, and that he usually just stayed home because he was

unable to travel.  A.R. 813.

Mr. Rathke admitted that he was able to feed his pet pig, a chore which

entails lifting a four-pound bucket of feed.  A.R. 814.  He said his morning

routine consisted mostly of sitting down, watching television, and taking his

pills.  A.R. 814. He testified that he was able to cut wooden boards into trim for

the interior of his house, and to screw the wood to the wall with a screw gun

after a break.  A.R. 815.

Mr. Rathke stated that he ate only once a day, drank coffee daily, and

smoked a pack of cigarettes daily.  A.R. 815.  Mr. Rathke stated that he worked

on his family's vehicle when he felt up to it.  Id.  He said he changed the

alternator four months previously, and that this piece of the vehicle was "right

down on the bottom" of the vehicle.  Id.  Mr. Rathke was able to pick up his

children's toys in the yard.  A.R. 819.

Mr. Rathke testified that he never helped his wife with cooking because

"the smell and looks of food" made him ill.  A.R. 816.  He admitted to smoking a

marijuana joint once every evening, and testified that this act made him

hungry, so he was then able to eat.  Id.  Rathke said he tried to help his

children with homework after dinner, then spent time with his family.  Id.

Rathke stated that he was able to dress himself and attend to his personal

hygiene needs, but would not shop for food because being around people "drives [him] nuts." A.R. 818.

Mr. Rathke stated that he didn't exercise due to knee pain, and that he engaged in no social activities at all, but was able to buy marijuana when it became available. A.R. 819. He stated that he did not have social visitors and did not talk on the telephone to anyone. A.R. 819-20. He testified that he didn't read or watch TV very much because he was unable to remember what he read or saw. A.R. 819.

Mr. Rathke said he was unable to sit or stand for more than one or two hours per day. A.R. 820. He testified that he could walk only a block before needing to rest. Id. He stated that he was able to lift 35-40 pounds, but only with his right arm and could carry that weight across the length of a room with his right arm. A.R. 820-21. Mr. Rathke stated he had difficulty lifting food or drink to his mouth with his left arm, but could feed himself. A.R. 821. He could reach and grab with his right arm without trouble. He had trouble balancing after taking his medications, but could navigate up and down a short number of stairs and pick up small items if he squatted to do so. A.R. 821.

Mr. Rathke's attorney questioned him about the various medications he was prescribed. A.R. 822. Mr. Rathke admitted using methadone for pain, but stated that he avoided going to doctors until he is "deathly in pain." A.R. 822-23. He testified about his hepatitis C and pancreatitis conditions causing him

to vomit "constantly." A.R. 823-24. Rathke said he sometimes had to lay down for a few hours at a time to "get the weight off [his] liver." A.R. 828. Rathke's attorney asked whether stress aggravated his stomach ailments, which Rathke admitted. A.R. 824. Mr. Rathke spoke again about smoking marijuana to increase his appetite. A.R. 825. Rathke said he had much difficulty with short term memory, and couldn't remember independently to take his medications. A.R. 827-28. Rathke's attorney asked no questions about traumatic brain injury or neurological dysfunction.

Mr. William Tysdal, the vocational expert, testified in response questions to from the ALJ and from Rathke's attorney. In response to a hypothetical question that a person who was limited to work at the light exertional level, was limited to occasional contact with supervisors and coworkers and only occasional face-to-face contact with the public, Mr. Tysdal testified that person could not perform any of Mr. Rathke's past relevant work. A.R. 830-31. Mr. Tysdal testified that a person with Rathke's age, education, work experience, and the aforementioned functional limitations *could* do other unskilled work available in significant numbers in the national or regional economy. A.R. 831. Mr. Tysdal specifically identified the occupations of electronics worker and survey worker at the light, unskilled level. A.R. 831-32. He identified the occupations of optical goods assembler and sorter at the sedentary, unskilled level. A.R. 832-33.

When asked by the ALJ about additional functional limitations, including that the hypothetical worker had to lie down or be otherwise removed from the work station for more than an hour and-a-half per every eight hour shift, Mr. Tysdal testified that he didn't believe any employer would tolerate that extensive a need to lie down, and so there was not any work that person could perform that existed in significant numbers in the national or regional economy. A.R. 833-34.

Mr. Rathke's attorney asked whether Mr. Tysdal's opinion would change if the additional hypothetical limitation were added that the person could complete simple, repetitive tasks for only four hours per day. A.R. 834. Mr. Tysdal testified that such an additional limitation would preclude employment on a full-time basis. A.R. 835. Mr. Tysdal said the sorter occupation would not necessarily be stressful to the average worker if given a period of time to become accustomed to the work. Id.

### C.    Decision of the ALJ

The ALJ issued his decision on November 21, 2006, concluding that Mr. Rathke was not entitled to disability benefits. A.R. 24-42. The ALJ applied the following five-step sequential analysis, which is the same for both Title II and Title XVI benefits. First, step one requires the ALJ to determine whether the claimant is engaging in substantial gainful employment.

If not, then step two requires the ALJ to determine whether the claimant suffers from a medically determinable impairment that is severe, or a combination of impairments that is severe. A medically determinable impairment can only be established by an acceptable medical source. An impairment or combination of impairments is severe if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of abnormalities that would have no more than a minimal effect on an individual's ability to work.

If the claimant suffers from a severe impairment or combination of impairments, the ALJ is required to determine at step three if the claimant's impairment or combination of impairments meets or exceeds the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). If the claimant's condition meets or exceeds a listed condition, then he is disabled. If not, step four requires the ALJ to determine whether a claimant's residual functional capacity allows her to return to any of his past relevant work. If not, step five requires the ALJ to determine whether the claimant can do any other work that exists in substantial numbers in the national economy given the claimant's residual functional capacity, age, education, and work experience.

The ALJ determined at step one that Mr. Rathke had not been engaged in substantial activity. A.R. 33. At step two, the ALJ determined that Mr. Rathke suffered from the following "severe" impairments: Hepatitis C, left shoulder osteoarthritis and chronic rotator cuff tear, major depression, generalized anxiety with social phobia, agoraphobia, post-traumatic stress disorder, and substance addiction disorder. Id. The ALJ noted that the Appeals Council remanded the matter in part because the record was unclear as to the nature and severity of Mr. Rathke's "chronic pain syndrome, chronic fatigue, pancreatitis, headaches, and carpal tunnel syndrome." A.R. 33. The ALJ noted the absence of any indication in the record that Mr. Rathke was unable to work due to any such conditions. Id. Mr. Rathke did not testify at the 2006 hearing that any of the conditions noted by the Appeals Council prevented him from working. Id. Mr. Rathke's attorney asked no questions of any witness about any of the conditions noted by the Appeals Council. The ALJ opined that the Appeals Council decided, without proof in the record, that such conditions had more than a *de minimus* effect on Mr. Rathke's ability to work. Id. The ALJ reviewed the various exhibits cited for reconsideration by the Appeals Council, but dismissed the exhibits and determined Mr. Rathke's "chronic pain syndrome, chronic fatigue, pancreatitis, headaches, and carpal tunnel syndrome" to be "not severe" under the Social Security Regulations. Id.

The ALJ noted that Mr. Rathke's medical records dated prior to his filing date included treatment for facial swelling and heartburn. A.R. 34. The ALJ found that these conditions did not significantly compromise Mr. Rathke's residual functioning capacity over time. Id. The ALJ also found that these conditions were well controlled with treatment at the time Mr. Rathke experienced them, so the ALJ determined that the facial swelling and heartburn were "not severe" under the Social Security Act and Regulations. Id.

In step two, the ALJ noted the Appeals Council's remand for consideration of Mr. Rathke's alleged borderline intellectual functioning and schizophrenia. A.R. 34. The ALJ found there were "no objective clinical findings in the record" to support a diagnosis of either disorder. Id. Accordingly, the ALJ dismissed the presence of either condition. Id.

At step three, the ALJ found that neither Mr. Rathke's impairments nor any combination of impairments met or exceeded a listed impairment. A.R. 34-35. The ALJ determined at step four that Mr. Rathke's residual functional capacity (RFC) rendered him unable to perform any past relevant work. A.R. 36-40. The ALJ provided a lengthy description of Mr. Rathke's RFC with several explicit limitations:

> The claimant retains a residual functional capacity for a light exertional level, who can sit, with normal breaks, for up to 8 hours in an 8-hour workday, stand and/or walk for up to 8 hours in an 8-hour workday, who should work where he can alternate between sitting, standing, and walking every 1 hour if needed, who can occasionally walk up or down stairs or steps but should not be

required to climb ladders, ropes or scaffolds, who can occasionally stoop or reach above shoulder level with left non-dominant arm, who should not be subjected to concentration [sic] exposure to dampness, humidity and noise, and should not be subjected to hazards of the work place such as unprotected heights, dangerous machinery and things of that nature, who should not work where his hepatitis C could present a danger to co-workers or customers, such as in the food service, medical service or any other type of occupation which might pose a danger, who should have only occasional contact with supervisors and co-workers, and only occasionally face-to-face contact with public but telephone contact is not a problem.

A.R. 36.

In arriving at this assessment of Mr. Rathke's RFC, the ALJ considered all of Mr. Rathke's symptoms, and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ also considered opinion evidence given by Dr. Enright, Dr. Falkenburg, and Dr. Greg Erickson. The ALJ did not consider any of the opinions of Dr. James Simpson, Ed.D., because the Appeal Council previously determined that Dr. Simpson was not an "acceptable medical expert" within the province of the Social Security Regulations. A.R. at 39-40.

The opinion of examining physician Dr. Falkenburg was given little weight by the ALJ because Dr. Falkenburg is a family physician with a generalized practice area, and there was no indication that she holds a specialization in addressing psychological issues. A.R. 39. Additionally, the ALJ found that the record did not support Dr. Falkenburg's diagnoses of schizophrenia or borderline mental functioning. Id. Furthermore, the ALJ found that Dr.

Falkenburg's opinions of severe mental limitations were not consistent with the overall record.  Id.  Finally, the ALJ found that Dr. Falkenburg's opinion was entitled to less weight because she did not treat Mr. Rathke during the relevant time period, that being the date of his psychological assessment.  Id.

The ALJ found that Mr. Rathke was forty-three years old at the time he filed his application for benefits, and that he had a limited education.  A.R. 40. The ALJ reviewed all the evidence in the record, including Mr. Rathke's medical records, the testimony at the hearing, and the various daily activity questionnaires submitted by Mr. Rathke from 1993 onward.  A.R. 33, 204-07, 239-42, 287-302.  Based on Mr. Rathke's age, education, past work experience, and RFC, the ALJ concluded that there were jobs existing in significant numbers in the national economy that Mr. Rathke could perform.  A.R. 40.  The ALJ specifically found that Mr. Rathke was unable to perform any past relevant work.  A.R. 40.  However, based on the testimony of the vocational expert, the ALJ found that Mr. Rathke could make a successful adjustment to other work, to include unskilled, light exertional level occupations such as an electronics worker or survey worker, as well as unskilled, sedentary exertional level occupations such as an optical goods assembler and nut sorter.  A.R. 41. Based on the conclusion that Mr. Rathke was capable of performing other work, the ALJ determined that he was not entitled to disability benefits.  Id.

## DISCUSSION

**A.    Standard of Review**

The decision of the ALJ must be upheld if it is supported by substantial evidence in the record as a whole.  See 42 U.S.C. § 405(g); Choate v. Barnhart,457 F.3d 865, 869 (8th Cir. 2006).  Substantial evidence is less than a preponderance, but enough evidence that a reasonable mind might find it adequate to support the conclusion.  See Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006); see also McKinney  v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision. See Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006); Craig v. Apfel, 212 F.3d 433, 435 (8th Cir. 2000).

The court's role under § 405(g) is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to re-weigh the evidence.  See Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  Furthermore, a reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' "  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005)

(quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)); see also Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004). The court must review the Commissioner's decision to determine if an error of law has been committed. See Olson ex rel. Estate of Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act. See Smith, 982 F.2d at 311; see also Olson ex rel. Estate of Olson, 170 F.3d at 824. If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently. See Baker, 457 F.3d at 892.

The same five-step analysis determines eligibility for Title II benefits as well as for Title XVI benefits. See House v. Astrue, 500 F.3d 741, 742 n.1 (8th Cir. 2007). The five-step sequential evaluation process as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot

perform past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. <u>Baker v. Apfel</u>, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

For purposes of clarification due to differing references in the pleadings and the Administrative Record, the court notes that a Social Security Title II claim is commonly referred to as a claim for Social Security Disability Insurance ("SSD") benefits. Disability Insurance Benefits ("DIB") are one of several subsets of benefits available under Title II. References to both SSD and DIB are made in this report and recommendation; both refer to Mr. Rathke's application for benefits under Title II. Benefits sought under Title XVI are known as Supplemental Security Income ("SSI") benefits.

**B.      Whether the ALJ Failed to Adjudicate Rathke's SSD/DIB Claim.**

Mr. Rathke's date-last-insured (DLI) for Title II Social Security Disability benefits was September 30, 1997. A.R. 189. Thus, the relevant time period in this case with regard to DIB entitlement is from March 15, 1993, Mr. Rathke's alleged onset date, through September 30, 1997, the date he was last insured for DIB. To obtain benefits under Title II, Mr. Rathke carried the burden of proving that a disabling condition existed before his insured status expired. <u>See Pyland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998).

In his brief, Mr. Rathke correctly asserts that in the case of degenerative or slowly progressive impairments, " 'where a claimant does not have

contemporaneous objective medical evidence of the onset of the disease, the ALJ must consider all of the evidence on the record as a whole, including the lay evidence and the retrospective conclusions and diagnosis of [his] doctor.' " Rowland v. Astrue, No. 08-5076-KES, 2009 WL 4111175, at *17 (D.S.D. November 23, 2009) (quoting Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997)). As a practical matter, then, the medical or other evidence of disability may be dated prior to *or* subsequent to the DLI. However, the earliest month for which the Social Security Administration will pay Title II benefits to a claimant is the month following the month the claimant made application for benefits. See 20 C.F.R. § 416.335. Regardless of the nature or severity of disability preexisting the date of application for Title II benefits, no payment will issue for the month of application or for any months prior to it. Id.

### 1.    Rathke's Second Application for Title II Benefits

For purposes of this appeal, Mr. Rathke focuses on his second and third applications for Title II (SSD or DIB) and Title XVI (SSI) benefits. Mr. Rathke's second application, filed in 1998 (A.R. 168), was denied by the state agency on the basis that there was insufficient evidence in the record to assess his anxiety disorder and "make an accurate assessment of the severity of [Rathke's anxiety] prior to the date [he was] last insured." A.R. 74. Mr. Rathke nonetheless asserts that the agency's denial is "obviously . . . based" on the flawed premise that the evidence of mental impairments must be *dated* prior to the DLI.

Docket No. 16, at 26.  This court disagrees with Mr. Rathke's reading of the agency's explicitly-stated rationale for denial of Mr. Rathke's second application for benefits.

The agency's notice of disapproved claim, dated May 19, 1999, states that "[e]vidence must clearly show that your impairments showed marked limitation prior to [September 1997]."  A.R. 74.  The agency's denial states that there was insufficient evidence to "make an accurate assessment of the severity of [Mr. Rathke's alleged disabilities] prior to the date [he] was last insured."  A.R. 74.  This court does not read the agency's statement as requiring the claimant to provide evidence *dated* prior to his DLI, but rather as requiring him to produce evidence that he was in fact disabled prior to the date he last met the earnings requirement for Title II benefits.

In its notice of denial, the agency simply notes that it was not provided with sufficient evidence to assess whether Mr. Rathke was disabled at any time prior to September, 1997.  A.R. 74.  There is no mention in the notice of disapproved claim that the agency required evidence *dated* during any particular time period, whether prior to or subsequent to the DLI.  Accordingly, this court finds that Mr. Rathke's second claim for SSD benefits was properly denied initially.  Thereafter, the claim was denied upon reconsideration, because the agency had again been provided with insufficient evidence to establish a period of disability prior to Mr. Rathke's DLI.  A.R. 80-82.  Thus, on

August 11, 1999, the Commissioner's decision with respect to Rathke's second Title II application became final.  See 42 U.S.C. § 405(g); Sims v. Apfel, 530 U.S. 103, 107 (2000) (where the Appeals Council grants review of a claim, the decision issued thereafter is the Commissioner's final decision).  Rathke had 60 days after the date of the Commissioner's final decision to commence suit in the district court.  See 42 U.S.C. § 405(g).  He failed to do so.  Thus, Mr. Rathke's appeal to the district court, dated November 4, 2008, requesting review of the agency's denial of his second application for SSD benefits is untimely.  His assertion that the ALJ improperly failed to adjudicate his second SSD claim is without merit.

### 2.    Rathke's Third Application for Title II Benefits

Mr. Rathke cites the Social Security Program Operation Manual System (POMS) in support of his argument that his third claim for disability benefits, a Title XVI application filed on April 2, 2003, also constituted a Title II application for SSD benefits.  Docket No. 16, at 27; A.R. 172-74; See POMS SI § 00601.010(D)(1).  Rathke asserts that his third claim for Title II benefits is open, was not properly considered alongside his 2003 application for Title XVI benefits, and should be remanded for adjudication.  Docket No. 16, at 26-27.

The Commissioner asserts in response that the claim was, in fact, "denied initially" and that Mr. Rathke was twice notified that his third DIB claim was denied because he did not show that he was disabled before September, 1997,

the date he last met the earnings requirement for DIB.  See Docket No. 17, at

14; Docket No. 18, Supp. Cert. of Michael J. Astrue.  The Commissioner points

out that Mr. Rathke did not qualify for Title II benefits at the time he made his

most recent application for Title II benefits in 2003, failed to timely request

reconsideration of the agency's denial of his DIB claim in 2003, and therefore,

was not entitled to claim DIB in 2006.  Docket No. 17, at 14; Docket No. 18,

Supp. Cert. of Michael J. Astrue.  The Commissioner also argues that because

Rathke did not request reconsideration of the agency's denial of his Title II claim

in 1999, the claim was fully and finally adjudicated and should not be

remanded for reconsideration.  Docket No. 17, at 14.

Mr. Rathke points out that the Eighth Circuit Court of Appeals has

directed that, although not binding upon the Commissioner, an ALJ should

consider the Program Operation Manual System guidelines in determining how

benefits claims should be handled.  Docket No. 16, at 27.  See Shontos v.

Barnhart, 328 F.3d 418, 424 (8th Cir. 2003) (citing Berger v. Apfel, 200 F.3d

1157, 1161 (8th Cir. 2000) and List v. Apfel, 169 F.3d 1148, 1150 (8th Cir.

1999)).  POM GN § 00204.027(A) states that a Title XVI application is a

concurrent application for Title II benefits, and the Title II claim must be

adjudicated either by including a blanket adjudication paragraph on the Title

XVI award or denial notice per POMS GN § 00204.025B(2)(c), or by completing

and adjudicating a Title II application.  Where the open application for Title II

58

benefits is discovered after the Title XVI denial notice issues, the Title II application "must be completed and adjudicated per POMS GN § 00204.027(D), and a subsequent inclusion of a blanket adjudication paragraph is not permitted."  POMS GN § 00204.027 (A)(1).  The claim forms filed by Mr. Rathke on February 24, 2003, demonstrate that Mr. Rathke specifically sought Title XVI disability insurance benefits (A.R. 47-48), but the POMS make clear that a Title XVI application is to be concurrently handled as a claim for Title II benefits, so no specific designation that the claimant was concurrently seeking Title II benefits would generally be necessary.

Although there is no evidence that the ALJ considered the POMS guidelines in this case, this court nonetheless finds that consideration of the guidelines is unnecessary here, where the Title II application was properly adjudicated and closed prior to the date application was made for Title XVI benefits.  The ALJ correctly asserted that Mr. Rathke's third DIB claim was denied initially.  Rathke received notice on April 8, 2003, that his application for benefits was denied.  See Docket No. 18, Supp. Cert. of Michael J. Astrue.  The letter specifically states that Rathke's claim was denied because he did not qualify for "disability benefits."  Id.  The agency's use of the term "disability benefits," which applies to Title II benefits, rather than "supplemental security income," which applies to Title XVI, suggests that the agency *did* construe Rathke's third application as one for Title II benefits.  This runs contrary to

Mr. Rathke's claims that the ALJ failed to consider his Title XVI application as a concurrent application for Title II benefits. The letter of denial also clearly states that Rathke was entitled to present additional evidence that he was disabled on or before September 1997, and that he had 60 days to ask for an appeal. Id. Rathke did not request an appeal within 60 days of April 13, 2003.[38]

In response to the Commissioner, Mr. Rathke correctly states that the record contains two requests for reconsideration of this claim. Docket No. 19, at 3; A.R. 87-88. However, both of the requests for reconsideration were untimely as to Rathke's application of April 2, 2003, and the agency's subsequent denial, dated April 8, 2003. Assuming, as the agency did, that Rathke received the letter denying his application no later than five days after its date, April 8, 2003, the latest time he could have filed a timely request for reconsideration of that application would have been June 13, 2003. See 42 U.S.C. § 405(g). Mr. Rathke filed no request for reconsideration during that time period. It appears the agency sent another notification of denial to Rathke on September 12, 2003 (A.R. 83-86), but there was no *new* application for disability benefits filed during the period between April 2, 2003, the date of

---

[38]Although the notice of denial is dated April 8, 2003, the agency notified Mr. Rathke that it would assume he received the letter no later than 5 days after its date, which would have been April 13, 2003. See Docket No. 18, Supp. Cert. of Michael J. Astrue.

Rathke's last application for benefits, and September 12, 2003. The first request for reconsideration, filed by Rathke's wife, is dated September 12, 2003. A.R. 88. As to Mr. Rathke's application of April, 2003, this request for reconsideration is untimely. The second request, filed by Mr. Rathke's mother, is dated October 12, 2003. A.R. 87. It is similarly untimely as to Rathke's final application for benefits.

Therefore, based on the ALJ's correct assertion that the third and final Title II claim was initially denied, and that Mr. Rathke failed to timely request reconsideration of the benefits denial, this court recommends that the decision of the agency denying Title II benefits to Mr. Rathke be affirmed.

### 3.    Whether the Reopening Provisions of the Regulations Apply

Mr. Rathke argues that his Title II claims are nonetheless entitled to be reopened based on two Social Security regulations, which permit reopening of closed applications in limited circumstances. See 20 C.F.R. § 404.988. Rathke cites § 404.988(b) in his brief in support, but later argues that he "emphatically did not ask the Court to decide whether a prior claim should be reopened . . . ." Docket No. 16, at 26-27; Docket No. 19, at 4. Mr. Rathke admits his 1996 application "is beyond the reach of most of the reopening provisions at 20 C.F.R. § 404.988(b)," but he fails to inform the court why his second and third applications are not similarly time-barred.

Section 404.988(b) of Title 20 of the Code of Federal Regulations states that a determination or decision may be reopened "[w]ithin four years of the date of the notice of the initial determination if [the Social Security Administration] finds good cause, as defined in § 404.989, to reopen the case." Section 404.989 provides that "good cause" exists to reopen a determination or decision if "(1) New and material evidence is furnished; a clerical error in the computation of benefits . . . was made; or (3) the evidence considered in making the . . . decision clearly shows on its face that an error was made."    20 C.F.R. § 404.989(a).

The initial determination of the second application was made on May 19, 1999.  A.R. 74-77. Therefore, the latest date to reopen the application upon a showing of good cause would have been May 19, 2003.  The initial determination as to the third application was made on September 12, 2003. A.R. 83-86.  Thus, the latest date to reopen that application upon a showing of good cause would have been September 12, 2007.  Mr. Rathke has not made a timely motion for reopening either his second or third applications for benefits under 20 C.F.R. § 404.988(b) .

In any event, even if his requests to reopen his applications were timely, Mr. Rathke has failed to demonstrate good cause to reopen his 1998 and 2003 Title II applications pursuant to 20 C.F.R. § 404.989.  Because this court finds that the Title II claims were properly adjudicated and not appropriate for

judicial review, this court agrees with the Commissioner's assertion that the only Social Security benefits application before the ALJ and properly before this court is Mr. Rathke's 2003 application for SSI (Title XVI) benefits.  Accordingly, the only question left for this court to consider is whether the record contains substantial evidence supporting the Commissioner's decision that Mr. Rathke was not disabled from the time he filed his Title XVI application in February 2003, to the time the ALJ presented its denial of benefits decision, on November 21, 2006.  See A.R. 24.

## C.     Whether the ALJ Failed to Develop Retrospective Evidence

Mr. Rathke argues that the ALJ failed to develop evidence as to (1) Rathke's anxiety disorders and depression, and as to (2) the presence of listing 12.02 brain dysfunction.  Docket No. 16, at 28.  He speculates that the ALJ failed to link "firm diagnoses made in 1999" with "provisional diagnoses offered in 1996" due to a "rigid (but wrong) concept that the evidence had to pre-date the 1997 DLI."  Id. at 29.  Mr. Rathke asserts that because (in his belief) the evidence received from the medical source(s) about his anxiety and depression was inadequate to make a disability determination, the ALJ was obligated to seek additional evidence from his medical source(s), whether by asking for additional records, a new report, a more detailed report, or by directly telephoning the medical source(s).  Id. at 29-30 (quoting 20 C.F.R. §§ 404.1512(e), 416.912(e)).

63

Rathke also asserts that the ALJ failed to develop evidence as to brain dysfunction because no comprehensive neuropsychological examination was completed prior to the 2006 hearing. Docket No. 16, at 30. Rathke cites to the results of a Halstead-Reitan battery completed in March, 2009, by psychologist James Dickerson, Ph.D., to support his claim that he was prejudiced by the ALJ's failure to order the battery. Id. at 30-31.

The Commissioner argues in response that reversal due to failure to develop the record is only justified where the ALJ's failure is unfair or prejudicial, and neither circumstance is present. Docket No. 17, at 16 (citing Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995)). The Commissioner asserts that any claim that Rathke was disabled and entitled to Title II benefits as a result of head trauma and brain injury has been adjudicated and is barred by *res judicata*, and therefore the ALJ was not required to develop the record with retrospective evidence as to whether Rathke was disabled prior to his DLI. Docket No. 17, at 17. The Commissioner also asserts that Mr. Rathke has not shown the "good cause" required by 42 U.S.C. § 405(g) to justify remand for failure to develop the record. Id. He argues that the record contained "ample evidence" regarding Rathke's mental disorders and alleged brain injury, so the ALJ was not required to further develop the record. Id.

Mr. Rathke's reply brief further asserts that Rathke's inability to participate in the neuropsychological evaluation previously was due to indigence, and that this constitutes "good cause" for failing to introduce Dr. Dickerson's report at the 2006 hearing.[39] Docket No. 19, at 6-7.

### 1. Whether *Res Judicata* Applies to Rathke's Previous Claims

In a Social Security Proceeding, the ALJ is required to "investigate the facts and develop the arguments both for and against granting benefits." Sims v. Apfel, 530 U.S. 103, 111, 120 S.Ct. 2080, 2085 (2000). However, Rathke did not timely appeal the agency's denials of his applications for benefits, and the ALJ did not, at any point thereafter, reopen the earlier hearings or decisions. The Eighth Circuit has recognized that where the ALJ does not reopen a final decision or prior hearing, *res judicata* applies, and the parties are foreclosed from re-litigating the merits of the earlier claim(s). Bladow v. Apfel, 205 F.3d 356, 360 n.7 (8th Cir. 2000) (principles of *res judicata* apply where ALJ does not reopen a denied application for benefits); see also Robbins v. Secretary of Health and Human Services, 895 F.2d 1223, 1224 (8th Cir. 1990) (per curiam) (where

---

[39]Rathke asserts that The Equal Access to Justice Act permits him to bill the reasonable expenses incurred by his expert witness, Dr. Dickerson, in preparing the neuropsychological report. 28 U.S.C. § 2412(d)(2)(A). However, the language of the statute permits reimbursement of costs to "the prevailing party in any civil action . . . ." As Rathke has not won a favorable judgment with respect to his applications for Social Security benefits, and has not prevailed on appeal, the court believes that Rathke cannot be said at this time to be a "prevailing party" for purposes of reimbursement under 28 U.S.C. § 2412. Accordingly, his request for reimbursement of Dr. Dickerson's costs is premature.

the ALJ does not reopen a previous hearing, principles of *res judicata* apply).

So, although the Commissioner failed to explicitly plead *res judicata*, the

principles nevertheless apply in these circumstances. This court agrees with

the Commissioner that there was no duty on the part of the ALJ to develop

testimony in 2006 about whether and to what extent Mr. Rathke was disabled

before September, 1997, because the agency had already issued two previous

denials of that claim and did not reopen either claim.

### 2. Whether Good Cause for Reopening Rathke's Claims is Present

Mr. Rathke argues that his indigency constitutes good cause for failing to

present psychologist Dr. Dickerson's report at any time prior to March, 2009.

This court disagrees. By itself, a claimant's indigence does not constitute good

cause for failing to present additional medical evidence at a prior proceeding.

Hepp v. Astrue, 511 F.3d 798, 808 (8th Cir. 2008) (finding that the claimant did

not establish good cause for failing to obtain the medical information prior to

the time the administrative record closed, where the information could have

been obtained and presented to the ALJ prior to the closing of the record). Good

cause for failure to present evidence may be shown, however, where the

evidence did not exist previously. Mahan v. Astrue, No. 4:09-CV-292-DDN, slip

op. at 11 (E.D. Mo. Dec. 21, 2009) (citing Goad v. Shalala, 7 F.3d 1397, 1398

(8th Cir. 1993)(finding that because the evidence claimant provided did not exist

at the time of the ALJ's ruling, good cause existed to excuse claimant's failure to

include the records in the administrative hearing)).  To that end, Mr. Rathke *has* made a sufficient showing of good cause under 42 U.S.C. § 405(g).

However, the inquiry does not end with a showing of good cause.  In addition to the good cause requirement,  42 U.S.C. § 405(g) requires that the new evidence be *material*.  Medical evidence meets that requirement if " 'if it relates to the claimant's condition on or before the date of the ALJ's decision.' " Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991)(quoting Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990)).  The Eighth Circuit Court of Appeals has held that a medical report and psychological evaluation conducted twenty months after the ALJ's report were too removed in time from the ALJ's decision to be material to that decision, and could at most establish "some deterioration" in the claimant's "overall medical condition" twenty months after the ALJ's ruling.  Goad, 7 F.3d at 1398.

Here, Rathke asserts that the neuropsychological evaluation, conducted some two and a half years after the ALJ's decision on November 21, 2006, is enough by itself to warrant a Sentence Six remand under 42 U.S.C. § 405(g). The court disagrees, and instead finds that Dr. Dickerson's evaluation is immaterial to Mr. Rathke's condition on or before the ALJ's decision in November, 2006, and does not justify a remand under 42 U.S.C. § 405(g) for failure to develop the record.    Goad, 7 F.3d at 1398.  At most, Dr. Dickerson's

report helps establish Mr. Rathke's condition at the time he was evaluated in March, 2009.

### 3. The Effect of Counsel's Silence at the 2006 Hearing

It is important to note that at the October, 2006, hearing, Mr. Rathke's counsel failed to even broach the subjects of Mr. Rathke's 1995 head injuries, chronic pain syndrome, chronic fatigue, pancreatitis, headaches, carpal tunnel syndrome, or any need for further neurological testing, despite there being a medical expert present who presumably could have testified as to the existence or severity of any of the conditions. The fact that Rathke's counsel failed to mention the subjects of neurological and other impairments at the hearing suggests that the existence or severity of any such impairments, if they existed, was minimal. See, e.g., Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). Mr. Rathke has failed to demonstrate how the record is insufficient as to the presence or absence of these impairments.

He similarly fails to demonstrate how he was prejudiced, nor could he do so without implicating his counsel's omission to develop the record as to the brain injuries or request further neurological evaluation despite having ample opportunity to do so. See Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). While the ALJ is obligated to develop the record, he is not required to act as the claimant's counsel. Clark v. Shalala, 28 F.3d 828, 831 (8th Cir. 1994); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Rathke was represented by

counsel at the administrative hearing and was treated fairly, so remand is not required.  <u>Shannon v. Chater</u>, 54 F.3d 484, 488 (8th Cir. 1995) (holding that remand to develop the record was unnecessary where claimant was represented by counsel at the administrative proceeding, was treated fairly, and failed to show prejudice).  Thus, the court recommends that the claimant's request for remand for failure to develop the record be denied.

**D.      Whether the ALJ Conducted an Appropriate Analysis at Step Three**

Step Three of the ALJ's analysis requires a determination whether any medically "severe" impairment, by itself or combined with other impairments, meets or equals any of the listed impairments that are so severe as to presumptively preclude substantial gainful activity.  <u>See</u> 20 C.F.R. §§ 416.925-416.926 & pt. 404, subpart P, App. 1.  The claimant bears the burden of establishing that his impairments meet or equal listed impairments.  <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004).  If the claimant presents more than one impairment, the ALJ should consider the combined effect of the impairments.  <u>See</u> <u>Shontos v. Barnhart</u>, 328 F.3d 418, 424 (8th Cir. 2003).

Here, Mr. Rathke argues that the evidence of pain and mental disorder in the record could support a finding that his impairments equaled a listing.  Docket No. 16, at 32.  He argues that the ALJ should have found that the evidence "could support a finding" that the "B" criteria were met for listings

12.04 (affective disorders) or 12.06 (anxiety disorders).[40]  Docket No. 16, at 32.

He asserts that there was "support for finding 'B' criteria were present."  Id.

Mr. Rathke does not address whether, or how, the "C" criteria were met.  The

Commissioner argues in response that there is substantial evidence to support

the ALJ's finding that Mr. Rathke's combined conditions did not meet a listing,

and that the ALJ properly considered the combined effects of Rathke's pain and

mental disorders in holding that Rathke did not have marked impairments

sufficient to satisfy the listings.  Docket No. 17, at 19-20.

    Rathke cites Senne v. Apfel, 198 F.3d 1065 (8th Cir. 1999), in support of

his assertion that where a listing appears to be met but the ALJ fails to provide

a medical explanation, the Eighth Circuit will find a lack of substantial evidence

to support the ALJ's finding at Step Three.  See Docket No. 16, at 32.  However,

in Senne, the claimant argued that the ALJ "insufficiently explained the finding

---

[40] For example, a listing of 12.04 - Affective Disorders would require a medically-documented demonstration that Mr. Rathke had either continuous or intermittent (1) depressive syndrome characterized by at least four out of nine listed symptoms; or (2) manic syndrome characterized by at least three of eight listed symptoms; or (3) bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and characterized by either or both syndromes); AND resulting in at least two of four limitations; or a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and at least one of three types of functional decompensation.  When listed in this way, it is more clearly evident that *possibly* satisfying *some* of the "B" criteria is wholly inadequate.

that he did not suffer from a listed impairment." Id. at 1067.  In that case, the

ALJ's decision with respect to step three was conclusory and perhaps deficient

in detail.  Id.  The Eighth Circuit pointed out, however, that the rule in the

Eighth Circuit is that where the opinion of the ALJ is conclusory or deficient,

the decision is nonetheless *not* appropriate for remand "where the deficiency

had no practical effect on the outcome of the case."  Id. (quoting Benskin v.

Bowen, 830 F.2d 878, 883 (8th Cir. 1987)).

Rathke does not make the argument that the ALJ's opinion is conclusory,

nor could he.  The ALJ's decision as to Rathke's combined impairments

discusses evidence in the record, notes that there was *no* evidence to establish

the presence of the "C" criteria of listings 12.04 and 12.06, and explains at

length why the various listings, including 12.04, 12.06, 1.01, and 5.05, were

not met.  A.R. 34-36.

Regardless of whether some "B" criteria were present, Rathke has the

burden to show that his impairment or combined impairments meet *all* of the

specified criteria, not just a portion or subsection of the criteria.  Sullivan v.

Zebley, 493 U.S. 521, 530 (1990).  To overturn the ALJ's decision with respect

to step three, Mr. Rathke was required to demonstrate that all of the criteria of

the listings were met, and that there was no substantial evidence in the record

to support the ALJ's decision with respect to his analysis at step three.  He has

not carried this burden.  He argues that only some of the "B" criteria were met,

and wholly fails to discuss the "C" criteria of the listings. Accordingly, this court finds that the ALJ conducted an appropriate analysis at step three, and recommends that the ALJ's decision be affirmed as to this issue.

**E.      Whether the ALJ's Credibility Assessment is Supported by Substantial Evidence.**

In making an assessment of Mr. Rathke's subjective complaints, the ALJ was required to consider all the evidence relating to his subjective complaints, as well as evidence presented by third parties, including (1) his daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While the ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit Court of Appeals has stated, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003); see also Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). A reviewing court should not disturb the decision of an ALJ who seriously considers the claimant's subjective complaints but nonetheless determines that the complaints are less than credible. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001).

Mr. Rathke takes issue with the ALJ's credibility determination as a whole, but takes specific issue with ten of the various reasons set forth by the ALJ for finding that Rathke was less than credible. Docket No. 16, at 32-36. He asserts that the ALJ failed to consider the <u>Polaski</u> criteria, and instead "applied idiosyncratic criteria" in making a credibility assessment. <u>Id.</u> at 36.

The Commissioner argues that Mr. Rathke's subjective complaints were properly discounted, given the inconsistencies in the record as a whole, and that the ALJ did seriously consider the <u>Polaski</u> factors but nonetheless found Rathke's complaints to be less than credible. Docket No. 17, at 20-21. The Commissioner also argues that the ALJ gave appropriate weight to the respective opinions of Drs. Erickson, Falkenburg, Enright, and Dang. <u>Id.</u> at 23-27.

In his decision, the ALJ set forth in detail the law for making a credibility determination under <u>Polaski</u>, the Social Security Regulations, and other applicable case law. A.R. 31. In applying the law to the evidence before him, the ALJ found "the claimant's statements concerning his impairments and their impact on his ability to work are not entirely credible in light of the medical evidence and the discrepancies between the claimant's assertions and the information contained in the documentary reports." A.R. 36-37. This court will address in turn each of the ALJ's findings with which Rathke takes issue.

## 1.    Rathke's Failure to Undergo Treatment for Hepatitis C

Mr. Rathke argues that the lack of treatment for his hepatitis C is not properly considered in making a credibility determination.  Docket No. 16, at 33.  He asserts that the ALJ made unqualified medical opinions that receiving treatment for these conditions would alleviate pain and psychosomatic symptoms such as anxiety and depression.  Id.

The ALJ noted that while Rathke complained that his hepatitis C causes him pain significant enough to interfere with his ability to work, he reported no medication or treatment for the disease.  A.R. 36.  Indeed, Rathke opted not to receive available treatment for his hepatitis C, despite his own admissions and his doctors' notations that his conditions were managed relatively well on medications.  A.R. 37; 502-03, 507, 511-12, 618-19, 668, 686, 690-91, 702, 705, 809-10.  The record demonstrates that although there are treatment options available for persons stricken with hepatitis C, Rathke both chose not to undergo the treatment and was decidedly not an ideal candidate for the therapy due to his "severe psychiatric history."[41]  A.R. 691.  Dr. Erickson noted in 2004 that Rathke was not a candidate for Interferon therapy due to his "history of noncompliance and substance abuse."  A.R. 494-95.  Significantly, Rathke

---

[41]The records show that Interferon therapy was discussed with Rathke, but Rathke refused to participate in this treatment.  A.R. 503, 691.  It was also generally agreed upon by his examining physicians that Interferon treatment is contraindicated for persons like Rathke who have depression or other psychiatric disorders.  Id.

himself declined the treatment after being told that he would have to abstain from using any drugs or alcohol for six months prior to beginning treatment. A.R. 503. It is not unfair to infer that Rathke was unwilling to give up his substance abuse in return for improving his hepatitis condition.

The court believes it is significant to point out that in order for Rathke to receive Social Security benefits due to an inability to work, he must follow treatment prescribed by his physician if the treatment can restore his ability to work. A.R. 37; 20 C.F.R. § 416.930; Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995). It goes without saying that where a medication or treatment exists to lessen the severity of a claimant's condition and improve his ability to work, the claimant does not have the option to forego the treatment in favor of debilitation. Although the side effects of Interferon therapy may be harsh, Rathke never even attempted compliance with it, or with any other medication or treatment. Thus, the ALJ properly considered Rathke's avoidance of treatment as an aggravating factor under Polaski.

Moreover, the lack or infrequency of treatment with respect to the severity of a claimant's subjective complaints is a proper basis for discounting subjective complaints. Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987). The ALJ's decision noted both of these guidelines in weighing the credibility of Rathke's complaints about his hepatitis C. A.R. 37. It is clear that the ALJ found inconsistences among Rathke's subjective complaints and the evidence in the

record, so it was proper for the ALJ to find that Rathke was less than credible. Polaski, 739 F.2d 1320, 1322 (8th Cir. 1984). There is substantial evidence in the record as a whole to support the ALJ's finding.

### 2. Rathke's Lack of Mental Health Counseling

Mr. Rathke argues that the ALJ made an improper medical opinion with respect to Rathke's mental disorders, in that none of the medical professionals opined that treatment with psychotropic drugs alone was a basis for discrediting Rathke or finding the mental conditions not to be severe. Docket No. 16, at 33. The Commissioner argues that Rathke's lack of mental health counseling demonstrates that his mental health was not as severely disabling as Rathke claims. Docket No. 17, at 23.

The court finds that a medical opinion as to either of the examples cited by Mr. Rathke is unnecessary under these circumstances. The ALJ noted that Mr. Rathke depends on psychotropic medications to manage his anxiety and depression, but receives no mental health counseling in conjunction with the medications, and in fact has *never* sought mental health counseling for his anxiety or depression. A.R. 37. The record clearly demonstrates that Rathke's anxiety, depression, and other conditions were well-controlled by benzodiazepines, anti-depressants, and other medications. A.R. 256, 502-03, 507, 511-12, 517, 570, 618-19, 668, 686, 690, 702, 705, 809-10. Thus, the fact that Rathke never required more extensive treatment from a mental health

professional indicates that the psychotropic drugs he received from his physicians were effective, and his mental impairments were adequately controlled with the same. In turn, this supports the ALJ's determination that Rathke's mental impairments were not severe. See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (holding that impairments well-controlled with treatment do not support a finding of total disability); Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992) (holding that claimant's mental disorder was not disabling in the absence of treatment beyond prescription medication). Accordingly, this court finds that there is substantial evidence in the record as a whole to support the ALJ's credibility finding as to Rathke's mental conditions.

### 3. Rathke's Use of Marijuana to Control Weight

Mr. Rathke argues that it is his daily "treatment" of smoking marijuana which provides him with any appetite for food and which has kept his weight at a normal level since age 18. Docket No. 16, at 33-34. The Commissioner does not specifically address Rathke's use of marijuana, but seems to imply that this behavior is inconsistent with claims of disabling pain. Docket No. 17, at 21-22.

The court disagrees that marijuana is a properly considered "treatment" for purposes of increasing appetite and minimizing weight loss, but notes that there is substantial support in the record for the ALJ's decision that the marijuana use apparently has had no effect on Rathke's ability to maintain his body weight during adulthood. By Rathke's own testimony, his weight has been

low but stable throughout his entire adulthood.  A.R. 806.  There is no indication of significant fluctuation in Rathke's weight in the medical records. See A.R. 428 (dating from 1995, stating Rathke was "Well-developed, well-nourished"), A.R. 434 (dated 1994, Rathke self-reported a weight of 145 pounds); A.R. 466; 152 pounds); A.R. 460 (dated 1998; 158 pounds); A.R. 450, 457 (dated 1999; 158-159 pounds); A.R. 503 (dated 2002; 161 pounds); A.R. 508 (dated April, 2003; 154 pounds); A.R. 511 (dated February, 2003; 160 pounds); A.R. 506 (dated June, 2003; 146 pounds); A.R. 620 (dated September, 2003; 138.5 pounds); A.R. 670 (dated December, 2003; 153 pounds); A.R. 667 (dated January, 2004; 154 pounds); A.R. 691 (dated April, 2006; 160 pounds). Aside from a weight decrease in 2003, followed shortly thereafter by a weight gain, Rathke's weight has generally remained stable over the years.  There is no evidence to support the assertion that Rathke was able to control his weight using marijuana, nor that such a practice was necessary.  Therefore, there is substantial evidence in the record as a whole to support the ALJ's adverse credibility finding with respect to Rathke's body weight and the need to smoke marijuana in order to eat and maintain his weight.

### 4. Infrequent Doctor Visits

The ALJ also noted that the record reflects infrequent visits to doctors and sparse documentation of treatments received, relative to the allegedly totally disabling nature of Mr. Rathke's symptoms.  Id.  Mr. Rathke argues that,

relative to a claimant who is indigent, the number of visits to doctors is ample. Docket No. 16, at 34. The Commissioner asserts that visits to doctors were infrequent, and the fact that Mr. Rathke never sought mental health treatment is significant. Docket No. 17, at 22-23.

The court notes that many of Rathke's appointments with Dr. Falkenburg were necessary only to refill prescriptions for his high-dose narcotics, and the visits were required in order to determine whether or not Rathke was abusing narcotics or needing refills prematurely. A.R. 618, 689-705. These repeated appointments were essentially routine in nature, and his physician generally reported his various conditions to be well-controlled with medications. Rathke's trips to the emergency room were often necessary after he failed to refill his prescriptions on time and subsequently suffered withdrawal symptoms or exacerbation of conditions that had been previously well-controlled with medications. A.R. 625, 689. Relative to the allegedly disabling nature of his various conditions, then, his medical records show infrequent doctor visits, and this is a proper consideration for the ALJ. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006)(failure to diligently seek medical care is a proper consideration for the ALJ); Wingert v. Bowen, 894 F.2d 296, 299 (8th Cir. 1990)(ALJ may properly consider whether claimant requires regular medications or visits to physician); Williams v. Bowen, 790 F.2d 713 (8th Cir. 1986)(merely occasional use of prescription pain medication is properly

considered when weighing claimant's credibility).  Furthermore, the fact that

Mr. Rathke never sought treatment for his psychological impairments other

than prescription medications indicates that his condition was less than

disabling.  Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)(quoting Brown v.

Barnhart, 390 F.3d 535, 540 (8th Cir. 2004)("If an impairment can be controlled

by treatment or medication, it cannot be considered disabling.")).

Having discussed Mr. Rathke's failure to obtain treatment for hepatitis C,

failure to seek mental health counseling, and infrequent visits to doctor, the

court now addresses Mr. Rathke's assertion that his indigency prevented him

from frequently visiting doctors and receiving treatment for his hepatis C and

mental disorders.  It is true that financial hardship may be considered when

determining whether to award benefits if the hardship prevents the claimant

from following a prescribed regimen of therapy.  Murphy v. Sullivan, 953 F.2d

383, 386 (8th Cir. 1992) (citing Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir.

1984)).  However, financial hardship is not determinative.  Benskin v. Bowen,

830 F.2d 878, 884 (8th Cir. 1987).  "Although lack of financial resources may in

some cases justify the failure to seek medical attention," id., Mr. Rathke's

financial state does not excuse him from seeking proper treatments.  The record

demonstrates he received insurance coverage under Medicaid for some period of

time.  When he presented to Dr. Falkenburg and apparently was no longer

covered by Medicaid or other insurance and was resultantly unable to afford his

prescriptions, she explicitly counseled him that he and his wife needed to obtain some kind of insurance coverage or financial assistance. A.R. 697. The record is not clear why Rathke was no longer covered by Medicaid, but given his complete lack of income, it may be that he was eligible for coverage but simply failed to follow through with the reporting requirements for Medicaid eligibility and was therefore removed from coverage. Conversely, if Rathke simply did not qualify for a Medicaid card, this would counter any claim that he suffered from financial hardship. Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992). There is no evidence in the record that Rathke attempted to find any free or low-cost medical treatment or mental health counseling for his conditions and was unable to do so. See Murphy, 953 F.2d at 386-87. Mr. Rathke's failure to visit doctors and obtain treatment should not be excused for lack of financial resources where there is no evidence he could not have remained on Medicaid, and no evidence suggesting he attempted to locate alternative resources to alleviate part of the financial burden caused by his conditions.

Based on the foregoing, this court finds that there is substantial evidence in the record as a whole to support the ALJ's adverse credibility assessment as to Mr. Rathke.

### 5. Conflicting Accounts of Physical and Social Limitations

Finally, the ALJ considered Mr. Rathke's conflicting reports of his ability to walk, lift and carry weight, and engage in day-to-day activities. A.R. 37.

The ALJ considered Mr. Rathke's self-reported ability to do work alongside the assessments made by his examining physicians. A.R. 38. The ALJ found that Mr. Rathke's self reports of social interactions and physical limitations varied from reports from third parties. Id. at 37-38.

In making his decision, the ALJ relied on Dr. Erickson's opinion of Rathke's RFC (A.R. 494-95) and did not adopt the RFC assessments by Dr. Falkenburg (A.R. 673, 675, 676, 710-14). A.R. 38. Dr. Erickson's assessment was generally consistent with Mr. Rathke's subjective reports of his abilities and limitations, but Dr. Falkenburg's opinions varied with her treatment notes and were inconsistent across time. Because Dr. Falkenburg's assessments were inconsistent, her opinions were properly discounted by the ALJ. Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009) (citing Juszczyk v. Astrue, 542 626, 632-33 (8th Cir. 2008) (unless well-supported and consistent with the other substantial evidence in the record, the ALJ need not defer to the treating physician's medical assessment); House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (holding that treating physician's opinion is not controlling where the evidence supporting it is inconsistent)). For the same reasons, the ALJ properly gave weight to Dr. Enright's assessment of Rathke's mental health conditions (A.R. 39, 799-801), and discounted Dr. Dang's opinions regarding Rathke's concentration, memory, and judgment (A.R. 39, 604, 606).

Upon reviewing the record, this court is convinced that the ALJ sufficiently addressed the Polaski factors, and that there is substantial evidence supporting his decision that Mr. Rathke's complaints were not fully credible. The ALJ pointed out numerous inconsistencies in the record as to Mr. Rathke's self-reported daily activities and abilities. The ALJ considered the duration, frequency, and intensity of Mr. Rathke's pain alongside the relatively infrequent treatments he received. See Benskin, 830 F.2d at 884. The ALJ noted the use of psychotropic medications and marijuana as well as the lack of medication to control the symptoms of Mr. Rathke's hepatitis C. Finally, the ALJ considered the conflicts among Mr. Rathke's self-reported functional restrictions, as well as the conflicting reports by his treating physicians.

Where inconsistencies exist in the record between the claimant's subjective complaints and his daily activities, a finding of diminished credibility is appropriate. Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). It bears repeating that a claimant's credibility is for the ALJ to determine, and where he has clearly considered the Polaski factors but found the claimant's subjective complaints to be less than credible, the decision should not be set aside by the reviewing court. Edwards, 314 F.3d at 966; Johnson, 240 F.3d at 1148.

**F.      Whether the ALJ Conducted a Proper Analysis at Step 4**

Mr. Rathke argues that the ALJ failed to formulate an RFC that expressed the impact of each of his findings at Step 2. Docket No. 16, at 39. Specifically,

Rathke says the ALJ failed to address mental limitations in formulating the RFC and failed to elicit opinions at the hearing from the non-examining psychological expert, Dr. Enright.  Id.  Rathke also argues that the ALJ improperly rejected the July, 2003, medical opinion prepared by Dr. Tobias Dang, while improperly giving controlling weight to Dr. Enright.  Id., at 40.  The Commissioner argues that the ALJ properly accorded substantial weight to Dr. Enright's opinion and properly gave no weight to Dr. Dang's opinion.  Docket No. 17, at 25-26.

"The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004)); see also Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (because RFC is a medical question, the ALJ's decision must be supported by some medical evidence of the claimant's ability to function in the workplace, but the ALJ may consider nonmedical evidence as well); Guilliams, 393 F.3d at 803 ("RFC is a medical question, and an ALJ's finding must be supported by some medical evidence.").  The ALJ "still 'bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence.' "  Guilliams, 393 F.3d at 803 (quoting Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000)).

Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC.  See 20 C.F.R. § 416.927(a)(2).  All medical opinions are evaluated according to the same criteria, namely:

–whether the opinion is consistent with other evidence in the record;

–whether the opinion is internally consistent;

–whether the person giving the medical opinion examined the claimant;

–whether the person giving the medical opinion treated the claimant;

–the length of the treating relationship;

–the frequency of examinations performed;

–whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

–the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

–whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 416.927(a)-(f); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue,

500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005)); 20 C.F.R. § 416.927(d)(2).  While entitled to special weight, "[a] treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)); see also House, 500 F.3d at 744.  The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion.  20 C.F.R.

§ 416.927(d)(2)(I).

One factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion is "if 'the treating physician evidence is itself inconsistent.' " House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786, and citing Wagner, 499 F.3d at 853-54, and Guilliams, 393 F.3d at 803).  "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix, 465 F.3d at 888 (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)), Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003), and Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict.  Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing

alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion.  Id.; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)).  However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's RFC determination, such a conclusion may be supported by substantial evidence.  Harvey, 368 F.3d at 1016.

Mr. Rathke's argument that the ALJ failed to consider Rathke's mental limitations in formulating the RFC is without merit.  Despite the ALJ's explicit findings that Rathke "has a history of . . . major depression, generalized anxiety with social phobia, agoraphobia and post-traumatic stress disorder, and a substance addiction disorder" (A.R. 33), Rathke argues that the ALJ "failed to incorporate mental limitations that were part and parcel of his DSM IV diagnoses that must be addressed in the formulation of RFC."  Docket No. 16, at 39.

Rathke's assertion fails to account for the fact that the source of the ALJ's findings as to Rathke's mental conditions appears to be Dr. Dang's opinion.  See A.R. 605 (diagnosing Rathke with Posttraumatic stress disorder, major depression, substance dependence, and possible mood disorder).  Rathke apparently believes the ALJ selectively ignored parts of Dr. Dang's opinion and did not consider Rathke's DSM-IV diagnoses in formulating the RFC.  This court

disagrees.  The ALJ's mere "failure to cite specific evidence does not indicate that it was not considered."  Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  Furthermore, given the ALJ's reliance on Dr. Dang's diagnoses, the court finds it " 'highly unlikely that the ALJ did not consider and reject' " those portions of Dr. Dang's report that are not explicitly referenced in the ALJ's decision.  Craig, 212 F.3d at 436 (quoting Black, 143 F.3d at 386).

Mr. Rathke next argues that the ALJ improperly gave controlling weight to the non-examining, consulting physician, Dr. Enright.  Docket No. 16, at 40. While it would be improper for the ALJ to rely on the opinion of a non-examining consulting physician to the exclusion of the conflicting opinions of a treating physician, Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999), in this case the ALJ did not rely solely on Dr. Enright's opinion to make his formulations.  Instead, the ALJ considered Dr. Enright's opinion in conjunction with the rest of the record which, as a whole, demonstrates substantial support for the ALJ's formulation of Rathke's RFC.  See A.R. 31 (stating that in reaching the conclusions about Rathke's RFC, the ALJ considered the effects of the claimant's alleged pain or other symptoms, all relevant evidence and the subjective complaints of the claimant, and the limiting effects of all the claimant's impairments even though the alleged impairments were determined to be non-severe); see also Harvey, 368 F.3d at 1016.

Furthermore, the ALJ acted properly in disregarding portions of

Dr. Dang's opinion wherein Dr. Dang placed limitations on Rathke's RFC that

did not comport with his own examination and testing of Rathke.  Dr. Dang's

clinical testing demonstrated that Rathke had only mild problems with short

term memory, which conflicts with Rathke's subjective reports and Dr. Dang's

ultimate opinion.  A.R. 604-06.  As stated previously, although an examining

physician's opinions are generally entitled to substantial weight, the ALJ may

properly disregard those opinions where the evidence is inconsistent with the

treating physician evidence as a whole or with other substantial evidence.

House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786, and citing Wagner,

499 F.3d at 853-54, and Guilliams, 393 F.3d at 803).

## G.    Whether the ALJ Conducted an Appropriate Analysis at Step 5

At step rive, the burden shifts to the Commissioner to establish that the

claimant maintains the RFC to perform a significant number of jobs within the

national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001).  In

this case, the ALJ concluded that Rathke was not disabled, in that he retained

the RFC to make a successful adjustment to work existing in significant

numbers in the national economy.  A.R. 40-41.  See 20 C.F.R. §§ 404.1520(g),

404.1560(c).  Where the claimant's limitations are exertional (physical) in

nature, the burden may be properly met by testimony from a vocational expert

or by referring to the medical-vocational guidelines.  Pearsall v. Massanari, 274

F.3d 1211, 1219 (8th Cir. 2001). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." Holley v. Massanari, 253 F.3d 1088, 1093 (8th Cir. 2001); accord Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir.2006). "For a vocational expert's opinion to be relevant, an ALJ must accurately characterize a claimant's medical conditions in hypothetical questions posed to the vocational expert." Harvey, 368 F.3d at 1016 (citing Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994).

Mr. Rathke claims that the ALJ's hypothetical was inadequate because it did not precisely relate Rathke's physical and mental impairments. Docket No. 16, at 41 (citing Jelinek v. Bowen, 870 F.2d 457, 416 (8th Cir. 1989)). Here, the ALJ asked the vocational expert to assume the existence of a worker of Rathke's age, education and past work experience who was limited to work at the light exertional level, could sit with normal breaks for up to eight hours in a normal workday, and could stand and/or walk for up to eight hours in a workday with normal breaks. A.R. 830. The ALJ continued with the hypothetical, asking Mr. Tysdal to assume the worker should work in a setting that allowed him to alternate between sitting or standing and walking every hour if necessary; was limited to only occasionally taking the stairs and should never go up or down

ladders, ropes, scaffolding; should only occasionally have to stoop and reach above the shoulder level with the left hand or arm.  Id.  The vocational expert was asked to assume that the worker should work where he was not exposed to concentrated dampness, humidity, or noise, or to workplace hazards like ladders, ropes, scaffolding, unprotected heights, or dangerous machinery.  A.R. 831.  The vocational expert was also asked to assume the worker shouldn't work in any environment where his Hepatitis C would present a danger to customers, such as in the food service or medical industries.  Id.  The ALJ hypothesized that the worker would have to have only occasional contact with supervisors or coworkers, and only occasional face-to-face contact with the general public, but was not restricted with regard to telephone work.  Id.  In response, Mr. Tysdal stated there were jobs in the light, sedentary, unskilled category that existed in significant numbers in the national economy.  Id.

The ALJ's hypothetical question comports with his findings and his discussion of Rathke's limited credibility.  A.R. 33, 36-40.  Therefore, this court finds unconvincing Rathke's argument that the hypothetical was lacking.  Rathke has failed to demonstrate that the ALJ mischaracterized his limitations and conditions.  An ALJ's hypothetical will not be considered inadequate where the ALJ omits those aspects of the claimant's subjective complaints that the ALJ considers non-credible.  Harvey, 368 F.3d at 1016-17; See Roberts v.

Heckler, 783 F.2d 110, 112 (8th Cir. 1985) (stating that the ALJ's hypothetical is sufficient if it sets forth the impairments accepted as true by him).

## CONCLUSION

Based on the foregoing, the court respectfully recommends that the decision of the agency denying benefits to Boyd Rathke be affirmed.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require *de novo* review by the district court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated January 27, 2010.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE